534 So.2d 1348 (1988)
Joseph F. BERNARD, Jr.
v.
CASUALTY RECIPROCAL EXCHANGE and Dodson Insurance Group.
No. 88-CA-319.
Court of Appeal of Louisiana, Fifth Circuit.
November 16, 1988.
Writ Denied January 20, 1989.
*1349 Quentin F. Urquhart, Jr., New Orleans, for defendant/appellee/cross-appellant, Cas. Reciprocal Exchange.
James S. Rees, III, Simon & Rees, New Orleans, for Joseph F. Bernard, Jr., plaintiff-appellant.
Before BOWES, WICKER and GOTHARD, JJ.
BOWES, Judge.
Both plaintiff and defendants have appealed a verdict in favor of plaintiff, Joseph F. Bernard, Jr. (hereinafter Bernard) and against defendants, Nelson Baudoin (Baudoin), Casualty Reciprocal Exchange (Casualty) and The Dodson Insurance Group (Dodson) in the amount of $50,000, subject to reduction by a finding of comparative negligence on the part of Bernard. We amend and, as amended, affirm.
Bernard was injured on December 21, 1985, while assisting Baudoin in the construction of a front end alignment pit intended for use in Baudoin's automobile repair service. Bernard and Baudoin were acquaintances, and Bernard was not in the employ of Baudoin. On the day prior to the accident, Bernard had brought a mutual acquaintance to Baudoin's Auto Service. While talking with one another, Baudoin asked if Bernard would help him to complete the unfinished pit, and Bernard agreed. Plaintiff saw the pit at the time, and returned the next day to begin helping Baudoin.
On that day, when Bernard arrived, Baudoin was not able to immediately begin the pit, and Bernard went into the area where the construction had begun. He swept the pit out prior to beginning to work with Baudoin. When Bernard finished sweeping, he and Baudoin commenced the job at hand. Bernard was instructed to get into the partially-completed pit, on the second level (approximately 20 inches below ground level), and Bernard would hand him boards on the left side to be carried to the right side of the pit for framing. To do so, Bernard had to navigate on the second level walkway, which was about two and one-half feet wide. In the walkway was incorporated, by design, a "step down" to a third level. Steps were eventually to be placed in the "step down", but, at the time in question, it was basically a "drop off", a gap of about two feet in the (approximately) 5 foot walkway, and approximately two and one-half feet in depth (to the bottom level of the pit). Bernard had to walk over this area, which narrowed considerably at the point of the gap to get to the other side of the pit, while carrying a board eight feet long and weighing 100 pounds.
Plaintiff did this successfully the first time. On being handed the second board, however, plaintiff attempted to balance it, and maneuver across the walkway when he stepped into the drop off, lost his balance and fell into the hole. He sustained a severe and permanently-disabling ankle injury, and instituted this action.
Following a jury trial on the merits, the jury rendered its verdict finding there was *1350 no defect in the premises, but further finding that both Bernard and Baudoin were negligent in the degrees of 45% and 55%, respectively, and that their (concurrent) negligence proximately caused plaintiff's injury. The jury made the following award:

Past medical expenses $ 8,500
 _____
Future medical expenses $ 5,500
 _____
Loss of wages to trial $10,000
 _______
Loss of future earnings $10,000
 _____
Past pain and suffering $ 3,000
 _____
Future pain and suffering $ 7,000
 _____
Permanent disability $ 6,000
 _______
 Total $50,000

The verdict was made the judgment of the court on January 6, 1988. It is that judgment which is presently on appeal. Plaintiff appeals the allocation of negligence on his part, as well as quantum on all but the awards for medical expenses. Defendant answered the appeal arguing the allocation of negligence as to Baudoin was erroneous.
NEGLIGENCE
Turning initially to the issue of negligence and the comparative fault of Bernard and Baudoin, we note that it is uncontested that Bernard was aware of the drop-off area prior to his fall. He had swept the pit shortly before the other work began.
On cross-examination, defense counsel questioned Mr. Bernard:
Q. Why did you step into the step-down?
A. Because at the moment I stepped into it, I didn't know it was there.
Q. You forgot it was there?
A. Yeah. It was in the back of my mind somewhere that it was there. I couldn't see it.
Q. But at that point, you forgot it was there?
A. Yes. [Emphasis added]
Mr. Bernard successfully passed the area once before he fell. Bernard had no previous experience working in an auto repair shop, garage, etc., and was not familiar with nor used to working in pits with step-down. In addition, his attention was undoubtedly diverted by the precarious task of carrying a swaying board, that was eight feet long and weighed over 100 poundsas he was requested to do by Baudoin.
On the other hand, Mr. Baudoin designed and constructed the pit itself, including the drop-off which he incorporated into his design from a brochure. He was aware that the drop-off, in its state of construction as of the date of the accident, was hazardous. The testimony reveals that he, himself, had previously stepped into the gap, lost his balance, and fell into the lower level of the pit. Boards were placed over the drop-off, keeping it covered whenever there was no construction work being performed on the pit. Baudoin stated that he removed the boards when work was being done or when someone was in the area because they presented a "tripping hazard", although he was not certain as to who removed the boards on the day in question, or even when they might have been removed. Baudoin assigned to Bernard the task of negotiating the second level walkway with the large heavy boards. There was nothing to alert Bernard when he was approaching the drop-off, which he was unable to see due to the load handed to him by defendant, and no verbal warning was given by Baudoin. Undoubtedly, the step-down in the pit was a dangerous hazard to one unfamiliar with it.
Considering these pertinent facts, we find that the jury was correct in its determination that Bernard and Baudoin were both negligent. However, we are of the opinion that the jury committed manifest error when determining the percentage of contributory negligence to assess to Bernard.
The Supreme Court, in Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985), offered guidelines in apportioning fault under the doctrine of comparative negligence. There, the court stated:

. . . . .
*1351 In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
In Turner v. New Orleans Public Service Inc., 476 So.2d 800 (La.1985), the court added another guideline which we think pertinent here:
"The greater the risk of harm to others, the greater is the fault."
As we have noted, the step down constituted a dangerous hazard which could have been eliminated by Baudoin and, although the ankle injury was serious and disabling, there could have occurred a far worse injury. Mr. Bernard fell two and one-half feet into a concrete pit while carrying a board weighing 100 lbs. Had he fallen on his head or lower spine, the results could have been disastrous, particularly if the board fell on top of him. We note, too, that Baudoin stood to gain by having the pit completed, and having Bernard assisting him, while Bernard was merely being a "good Samaritan" by helping a friend and stood to obtain no pecuniary gain whatsoever. Surely Baudoin was much more aware of the danger posed by the drop-off (particularly in connection with carrying boards, inasmuch as that is what he, himself, was doing when he fell) than Bernard, who had observed the area only once the day before and traversed it once minutes before the accident. Bernard was attempting to balance a heavy board while carefully traversing a drop-off in the walkway measuring approximately twenty-four by eighteen inches (at the point of the drop-off). Such a feat appears to us to require an extremely delicate sense of balance and Baudoin knew it could not be done without serious risk, having failed to safely do it himself:
Upon appellate review Louisiana courts have jurisdiction with regard to both law and facts. La. Const. art. V, § 10(B). However, we have held that
When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Canter v. Koehring Co., 283 So.2d 716, 724 (La. 1973).
This standard of appellate review was not intended to be applied so as to require upholding the ruling of a trial court simply, "when the evidence before the trier of fact furnishes a reasonable basis for its finding." Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978). Instead, a finding of fact by a trial court should be upheld "unless it is clearly wrong." And "appellate review of facts is not completed by reading so much of the record as will reveal a reasonable factual basis for the finding in the trial court." Id. Proper review requires that *1352 the appeal court determine from the record that the trial court finding is not clearly wrong or manifestly erroneous. Watson, supra.
Here, as in Watson, we find that the jury was clearly wrong in its determination that Bernard and Baudoin were almost equally at fault. Considering the pertinent facts of this case, and particularly those outlined above, in relation to the enunciated guidelines, we are of the opinion that the jury should have found that Baudoin was negligent to the extent of at least 75% and Bernard was negligent to the extent of no more than 25%, and that the jury's conclusions of percentages of negligence past these two respective points constitute manifest error.
"Contributory negligence is conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection. The standard of conduct to which the plaintiff must conform for his own protection is that of a reasonable man under like circumstances. The party relying upon contributory negligence has the burden of proving it.
"Failure to take every precaution against every foreseeable risk or to use extraordinary skill, caution, and foresight does not constitute negligence or contributory negligence.... [The victim] is required only to use reasonable precautions, and [his] conduct in this regard is not negligent if, by a common-sense test, it is in accord with that of reasonably prudent persons faced with similar conditions and circumstances." Dupas v. City of New Orleans, 354 So. 2d 1311 (La.1978).
A person is not required to exercise the utmost caution at each moment to avoid every hazard of which he was ever aware. Even the "reasonable man" is permitted an occasional lapse of memory. The critical inquiry is whether or not he was exercising ordinary care for his own safety at the time of the accident and whether or not it was reasonable to forget [the presence of the wire.]
[Emphasis supplied] Soileau v. South Cent. Bell Tel. Co., 406 So.2d 182 (La. 1981).
Having only seen the steps and drop-off once or twice shortly before the accident, we feel Bernard must be allowed some leeway in regard to a lapse of memory, particularly since he was occupied with carrying a heavy piece of wood. However, reasonable lapses of memory notwithstanding, we find that the jury was correct in concluding that Bernard was guilty of some degree of negligence. Therefore, we assign fault to him in the amount of 25%, while we assign 75% of fault and negligence to Baudoin, as we previously noted the jury should have done as reasonable minimum and maximum limits. We feel this is the least variance from the jury's verdict that the evidence and justice permit.

DAMAGES
I. PAIN AND SUFFERING
At trial, plaintiff offered the testimony of two orthopedic surgeons who treated him. Dr. Keith Larkin first saw Bernard in the emergency room following the accident. Plaintiff suffered from a severe medical sub-talar dislocation of his right foot and ankle, as well as several fractures in the metatarsal bones of that foot.
After finding that he was unable to reduce the dislocation in the emergency room, Dr. Larkin placed plaintiff under general anesthesia and a "closed reduction" procedure was performed, in which the joints were manipulated back into place. The limb was then placed in a splint. Mr. Bernard was released from the hospital two days later, on December 23, 1985. Dr. Larkin treated the plaintiff for over one year or through December, 1986.
Several days after the initial operation, plaintiff's foot was placed in a cast, at which time he developed painful fracture blisters, caused by swelling from the injury. *1353 In January of 1986, Dr. Larkin sent plaintiff to physical therapy. Plaintiff could not put any weight on that ankle until the end of February. Swelling and pain continued, although both lessened gradually over the next several months. By June, plaintiff was taken off crutches and his ability to move or flex the foot increased. By September, 1986, Dr. Larkin felt that plaintiff had reached a plateau with physical therapy and ordered him to discontinue same. At the time of his last visit to Dr. Larkin on December 29, 1986, Bernard still suffered decreased ankle motion, soreness, and swelling and Dr. Larkin stated:
"And at that time, I told him to come back when he needed my services, that he was going to have some potential problems with it, and when he needed me, I'd be there to do what I needed to do. I didn't want to give him a definite appointment, `cause I didn't know how long it was going to take him to develop a symptom."
Dr. Larkin also felt that plaintiff was a good candidate for traumatic arthritis in that joint. An overall disability rating to the entire foot of 25% was given by Dr. Larkin and he said Bernard could not do heavy labor, climb ladders, or walk on uneven ground.
Plaintiff began seeing Dr. Russell Grunsten, another orthopedic surgeon, in November, 1986, because he wanted a second opinion. Dr. Grunsten reviewed the medical material, including the X-rays taken at St. Jude, and described the injury to the jury as follows:
"So it's a severe injury. It is as though you almost tore that part of the foot away completely ..."
Dr. Grunsten found evidence of arthritic degeneration attributable to the injury. There was muscle atrophy in plaintiff's right leg of almost ¾ inch; the right foot had a loss of 15 degrees of ability to press down; a loss of 5 degrees of dorseflexion; a loss of 20 degrees in an up and down motion in that foot; a loss of half of his mobility of inversion and eversion. Overall, Dr. Grunsten estimated a 1/3 loss of plaintiff's range of motion.
On December 31, Dr. Grunsten felt that plaintiff could attempt to return to work (as a store manager) and see how the foot would tolerate standing and walking on a flat surface, inasmuch as daily walking and standing would be of benefit in rehabilitation. Dr. Grunsten opined that plaintiff suffers permanent mild atrophy of the right calf; permanent mechanical impairment, and restriction of motion in the ankle. He assigned a 25-30% permanent disability rating to the lower leg, foot and ankle. Further, he stated that it was reasonably certain ("... he will require one [fusion], in all likelihood, before his lifetime is over with ...")i.e., that Bernard would need a fusion in that ankle to relieve the pain, whenever the pain got to the point of being unbearable for plaintiff (fairly certain to happen, but time unpredictable).
Plaintiff himself testified that after falling, he remained in the pit for about a half hour before an ambulance arrived, during which time he was suffering "a lot of pain. It hurt real bad." He remained in the emergency room another three and a half hours without pain medication, waiting for Dr. Larkin. (This was evidently to ensure his unimpaired ability to consent to surgery.) He was given general anesthesia before the operation and was hospitalized from Saturday until Monday. He suffered large fracture blisters and endured a cast for weeks. He underwent painful and strenuous physical therapy three times a week for seven months. He had to use crutches for several months, had difficulty showering and tending to his personal needs, and, of course, his physical and recreational activities were reduced to almost nil.
In November, 1986, when he consulted Dr. Grunsten, plaintiff was unable to walk or stand more than 2½ hours without the pain requiring him to sit down. At the time of the trial, he could only stand 2½-3 hours before having to rest the foot. After *1354 3 hours, pain and swelling causes him to limp, although he now takes nothing stronger than aspirin to relieve the pain. He is not anxious to have the surgery, and will postpone it as long as possible.
Considering the extent and duration of plaintiff's injury, with emphasis on the hours of unrelieved pain prior to surgery, his submission to the dangers of general anesthesia, his subsequent endurance of blisters, casts, crutches, and therapy, we find the jury's award of $3,000.00 for past pain and suffering for two years prior to the trial to be so low as to constitute a gross abuse of discretion. Further, considering the likelihood of future surgery, with the danger and pain inherent therein; plaintiff's present inability to withstand walking or standing for any length of time exceeding three hours without pain and swelling; the limitations on his mobility due to the injury, and the continuing arthritic degeneration, we find that the jury's award of $7,000.00 for future pain and suffering was also an obvious abuse of discretion.
In regard to deciding whether or not an abuse of discretion occurred, we find the following jurisprudence pertinent:
... the initial inquiry must always be directed at whether the trier court's award for the particular injuries and their effects upon this particular injured person is, a clear abuse of the trier of fact's "much discretion." La.Civ.C. art. 1934(3) in the award of damages. It is only after articulated analysis of the facts discloses an abuse of discretion, that the award may on appellate review, for articulated reasons, be considered either excessive ... or insufficient.... Reck v. Stevens, 373 So.2d 498 (La.1979 Citations omitted)
Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court. Coco v. Winston Industries, Inc. 341 So.2d 332 (La.1976 Citations omitted)
A survey of the most similar types of injuries convinces this court that the lowest possible award due to plaintiff in accordance with the evidence presented in this case and reasonably within the discretion of this court for past suffering is the amount of $15,000.00 and future pain and suffering is $25,000.00. See Reck and Coco, both supra. See Black v. Ebasco Services, Inc., 411 So.2d 1159 (La.App. 1 Cir.1982); Merrell v. State, Through Dept. of Transp., 415 So.2d 660 (La.App. 3 Cir. 1982); and Bergeron v. Firestone Tire and Rubber Co., 482 So.2d 54 (La.App. 5 Cir. 1986) (in which no future surgery was anticipated).
II. DISABILITY
Similarly, under the foregoing facts, with particular emphasis on the disability rating assigned by Dr. Grunsten to plaintiff of 25-30% of the entire lower leg, foot and ankle, we find that the jury's award of $6,000 for permanent disability is another clear example of an abuse of discretion and, accordingly, we amend that sum to $25,000, the lowest possible award given in comparable cases, and the lowest award that we can give under the jurisprudence quoted above. See Black, supra; see also Istre v. ABC Ins. Co., 517 So.2d 1225 (La. App. 4 Cir.1987), in which a much higher award for this type of damage was affirmed.
III. LOSS OF WAGES
At trial, plaintiff presented the testimony of two expert witnesses in connection with his claim of loss of past and future wages.
Mr. Spencer Roberts testified as a vocational evaluation specialist who evaluated plaintiff. He related (as did plaintiff himself) Bernard's employment history. Bernard was a high school graduate whose earlier jobs had been unskilled labor. *1355 Plaintiff later obtained a business management degree from Delgado, after which he worked his way up to become an assistant manager at the Toy Center, in which he was, actually, doing floor sales and stocking shelves, as well as general manager this is considered, stated Roberts, to be semi-skilled work. He left that job in 1980 to start his own business, The Brass Connection, (which was ultimately a failure). While waiting for funds to begin that enterprise, Bernard sold cleaning products to the offshore industry, and also sold toys for a wholesale company. Neither of these ventures were successful.
In 1982, plaintiff worked with a friend to start a business called Cajun Popcorn. The work was considered light to medium unskilled activity, ranging from working on the assembly line to packaging popcorn. That business was also unsuccessful, and plaintiff left to finally open the Brass Connection stores. By October of 1984, the Brass Connection was failing and plaintiff returned to Cajun Popcorn, which had reopened, although he did not finally close his own stores until June of 1985. From October 1984 through October of 1985, plaintiff earned income from Cajun Popcorn. During the last few months of that employment, plaintiff worked there only sporadically because the project, once again, was in trouble. Plaintiff stated:
"... however, they were trying to sell the business and they asked if, from time to time, if they had any work for me, to come in an hour here or an hour there, or half a day here, would I do that while they were trying to sell the business, and, eventually, when it got sold, I'd have my job back again; so I agreed to do that."
In October, 1985, Cajun Popcorn closed. Therefore, at the time of the accident in December 1985, Bernard was unemployed.
At the time Roberts evaluated him, in December, 1987, plaintiff had been basically unemployed with the exception of several weeks of temporary work answering the telephone at his brother-in-law's electronic repair business. In addition, Bernard had attempted a data processing course through Manpower, but funding for that course had expired and therefore it was discontinued. Roberts concluded that Bernard had a narrow range of work experience and, functionally, that plaintiff could only stand or walk for two hours without pain or swelling. Therefore, plaintiff is restricted to sedentary work. With his average intelligence, Roberts concluded, after all tests and evaluations were complete, that plaintiff could attempt one of two general choices. If he receives no training, plaintiff is limited to unskilled or semi-skilled sedentary work, and this type of work pays only the minimum wage. Mr. Roberts concluded that Bernard was only qualified to perform thirteen (13) out of a possible 12,000 such unskilled jobs listed by the United States Department of Labor. Roberts further testified that plaintiff would have difficulty in competing even for these sedentary jobs because of his age (39) and the weak economy in this area.
Plaintiff could not return to store management because it requires extensive standing and walking. Alternately, said Roberts, plaintiff might build on his associate business degree by obtaining a university degree in a field such as accounting (in which he demonstrated ability). But this assumption was based on his completing a four year college course in three years without a part-time job (and without any explanation of how plaintiff would get funds to do this), and then spend another 5 to 7 years to work his way back to the wages he earned at the Toy Center and Cajun Popcorn (about $24,000-$26,000 annually). We find this particular proposal is not an entirely realistic or feasible alternative.
This expert's testimony was not rebutted by the defendants, who offered no expert in this field or any other evidence on this subject. Therefore, we can find no reason why the jury should have substantially questioned the validity of this expert's opinions and statistics, as they obviously did.
*1356 Dr. Melville Wolfson testified as an expert economist. He made his calculations based on plaintiff's ability to earn approximately $26,000.00 annually, which plaintiff had demonstrated he could do by his tax returns for 1979 and 1980:
"What we're interested in measuring is the extent of which his ability to make money or his earning capacity has been changed by the accident which occurred in 1985."
In calculating past lost earnings, Dr. Wolfson computed a loss, from December 1985 to the time of trial, of $50,780.00. In calculating a loss of future earning capacity, the basis used by Dr. Wolfson, again, was $26,000.00 per annum. Dr. Wolfson calculated the present value of the plaintiff's economic loss, if plaintiff was unable to work at all, to be $484,815.00. Alternatively, if plaintiff were able to obtain minimum wage employment, Dr. Wolfson felt the value of the economic loss would then be $354,287.00.
Again, the defendants failed to rebut or contradict in any manner the findings of this well-known expert, so the jury should have given Dr. Wolfson's opinions great weight. At trial and on appeal, defendants urge that plaintiff's loss of income, past and present, should be based on, and emphasis placed on, the fact that plaintiff was unemployed at the time of injury. Defendant attempted to average plaintiff's income from 1980-1985 to demonstrate that plaintiff's past loss of income was less than $7,000.00. This is not a correct application of the law as the Supreme Court plainly stated in Folse v. Fakouri, 371 So.2d 1120 (La.1979).
In reinstating a jury award for past lost earnings in that case, the Supreme Court deemed it proper to consider loss of earning capacity, as well as actual past lost wages:

What plaintiff earned before and after the injury does not constitute the measure. Even if he had been unemployed at the time of the injury he is entitled to an award for impairment or diminution of earning power. And while his earning capacity at the time of the injury is relevant, it is not necessarily determinative of his future ability to earn. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). Damages should be estimated on the injured person's ability to earn money, rather than what he actually earned before the injury. [Folse, supra] [Emphasis supplied]
Damages for loss of past wages are not necessarily limited to a multiplier of the amount earned at the time of injury. Walton v. William Wolf Baking Co., Inc., 406 So.2d 168 (La.1981).
A person who regularly works but who happens to be unemployed at the time of a disability accident suffers a loss of, and is entitled to special damages for, the wages he probably would have earned but for the accident, although it is plaintiff's burden to prove his probable earnings. South Central Bell Tel. Co. v. Branch, 360 So.2d 271 (La.App. 4 Cir.1978).
In Hirstius v. Louisiana Materials Co., Inc., 413 So.2d 611 (La.App. 1 Cir.1982), the court dealt with past lost wages of a plaintiff who earned about one-third to one-half of his former wages in the 2 years preceding his accident. Satisfied that the decline in income was not due to circumstances related to plaintiff's earning capacity, the court held:
Defendant's first argument is that the trial court erred in its finding of plaintiff's annual earning capacity at the time of the accident. It is argued that the proper way to ascertain this figure would be to average plaintiff's income from 1973 until the time of the accident. We disagree. Plaintiff is entitled to be compensated for his disability based on his earning capacity as of the time of the accident. [Emphasis supplied]
This case follows Folse, supra (a Supreme Court case). We agree and we are bound to follow the law as decreed by our Supreme Court.
*1357 We recognize that the trier of fact is not absolutely bound by expert opinions. Nevertheless, the calculations of an actuarial expert merit substantial consideration by the trier of fact. Garrett v. Celino, 489 So.2d 335 (La.App. 4 Cir.1986); Welton v. Falcon, 341 So.2d 564 (La.App. 4 Cir.1976). This is particularly true where, as here, there was no contradictory evidence presented on the subject. Dr. Wolfson's testimony was the only evidence on the issue of lost wages which the jury had before it, and his testimony was not substantially discredited in any way. Therefore, the jury was bound to give it serious consideration in arriving at their verdict. This they failed to do as their meager award so aptly demonstrates.
Dr. Wolfson's method of determining plaintiff's earning capacity is for the most part, although not totally, justified by Bernard's past work record. As was the court in Hirstius, supra, we are convinced that Bernard's decline in income between 1980 and the date of the accident was not due entirely to a loss of earning capacity and that he sufficiently proved his probable earnings so as to justify an award for past diminution of earning power. However, other factors evident to the jury are also evident to the court. For example, appellant voluntarily and imprudently quit his former employment to enter his own business which failed. We believe that the jury could have felt such facts affected plaintiff's earning capacity and so discounted the past lost earnings figure.
Nevertheless, we find that the jury award of $10,000.00, less than 20% of the only evidence in the record, for plaintiff's category of earning capacity is an abuse of discretion. With nothing to substantially contradict or impeach Dr. Wolfson's testimony, his credibility, expert status, or his calculations (most notably the absence of an expert on behalf of the defendants), the jury was bound to award a higher figure which more fairly approaches the figures given by Dr. Wolfson, while taking into account the variables mentioned. Therefore, we amend this portion of the judgment to reflect an award of $30,000.00 for past lost earnings as being the lowest figure which could and should have been awarded.
With regard to future lost wages, we find Dr. Wolfson's computations and basis therefore sufficiently reliable upon which to determine an award in this case. If the evidence had been reasonably conclusive that plaintiff is either permanently totally disabled, or only capable of earning a minimum wage, we would be inclined to accept Dr. Wolfson's total of lost income as the measure of Bernard's future loss of earning potential. Viewing the evidence in the light most favorable to defendants, however, Bernard's past history, in which we especially note his ability to earn an associate degree in business and his attempt to complete a course in data processing (aborted only because of a lack of government funding and not Bernard's ability) convinces us that Bernard's capabilities lie somewhat beyond minimum wage jobs. Mr. Roberts' alternative suggestion that Bernard could attempt to obtain a college degree in accounting, or some related area, may well have likewise convinced the jury that plaintiff is not permanently consigned to minimum wage labor or unemployment. However, Roberts went on to state that during the (recommended) three years that plaintiff attended school, he should not attempt to work because he (plaintiff) is older than the normal college student and, having been out of school for so long, would have to apply himself completely to his studies. Roberts further stated that, after completion of college, it would take another 5-7 years to work back to an annual salary of $26,000; in all likelihood, Bernard would begin at a salary in the $10,000-12,000 range.
Earning capacity in itself is not necessarily determined by actual loss; damages may be assessed for the deprivation of what the injured plaintiff could have earned despite the fact that he may never have seen fit to take advantage of that capacity. The theory is that the *1358 injury done him has deprived him of a capacity he would have been entitled to enjoy even though he never profited from it monetarily. [Emphasis supplied] Folse v. Fakouri, supra.
Mathematical projections of future earnings may be used as one of the guides employed by the courts in computing an award for loss of future income. Brown v. Southern Farm Bureau Ins. Co., 426 So.2d 684 (La.App. 1 Cir.1982)
Loss of future earning capacity cannot be calculated with mathematical certainty. Philippe v. Browning Arms Co., 395 So.2d 310 (La. 1981); Wilson [v. Aetna Casualty and Surety Company, 401 So.2d 500 (La.App.2d Cir.1981)], supra. As discussed in Wilson, supra, the testimony of an economist is entitled to weight, but since it is necessarily based on uncertain future events, it is not conclusive... The amount of damages awarded should, however, compensate plaintiff for the difference between his ability to earn immediately prior to the injury and his ability to earn after the injury. Coco, supra; Wilson, supra. Cutchall v. Great American Pump Co., 460 So.2d 1106 (La.App. 2 Cir.1984).
We are cognizant also of the possibility that plaintiff may obtain some pain relief from the recommended fusion, should he choose to avail himself of that surgery. Certainly, this court would not state that any plaintiff is obliged to undergo major surgery, with its incumbent risks, in order to mitigate defendants' liability for damages. However, we find that possibility may have been a factor which the jury may have considered in discounting the award for loss of future earning capacity. We also reject the idea of obligating plaintiff to return, at his age and state of life, to a strenuous university course in order to reduce defendants' liability, although, as we have already observed, that potentiality, along with Bernard's past demonstrated ability to complete academic courses, could also have influenced the jury. The data processing course was shown to have been interrupted by lack of finances, not lack of plaintiff's ability or interest.
In any event, we find that the jury could well have adjusted the totals figured by Dr. Wolfson to allow for the above factors, but to award only three per cent (3%) of the lowest figure given by that expert was not within the broad range of the jury's discretion and such an award constitutes abuse of that discretion. In our opinion, the enumerated factors justify some adjustment, and, as did the court in Black, supra, we also prefer to consider mathematical projections of future earnings as only one of several guides relevant to the determination of this award. Under the circumstances of this case, an award which we consider to be the lowest variance that we can allow from the jury award and one which we deem just to both appellant and appellee for loss of future earning capacity is $177,143. This sum is approximately one-half of appellant's loss as calculated by Dr. Wolfson, if plaintiff were able to obtain minimum wage employment, and, whereas we do not mean to employ a mathematical formula, we feel the circumstances of the present case justify our award.
It is apparent from the verdict that the jury arbitrarily decided to award a total amount of $50,000 to plaintiff and then divided that up into damage categories according to their own whim, without taking into serious consideration the uncontradicted, unimpeached and logical evidence offered by plaintiff. This they are not entitled to do and their action in doing so constitutes manifest error under our jurisprudence. Accordingly, we are bound to amend and increase their verdict to the lowest amounts that will conform to the evidence offered at trial.
For the foregoing reasons, the verdict of the jury and the judgment of the trial court is amended to reflect that plaintiff Joseph Bernard was 25% negligent in the accident which caused his injury, and defendant Nelson Baudoin 75% negligent. Therefore, the award of damages by the jury and the judgment of the trial court are both amended as follows:

*1359
Past Pain and Suffering $ 15,000.00
Future Pain and Suffering 25,000.00
Permanent Disability 25,000.00
Loss of Wages to Trial 30,000.00
Loss of Future Earnings 177,143.00
Past Medical Expenses
(unchangednot on appeal) 8,500.00
Future Medical Expenses
(unchangednot on appeal) 5,500.00
 ___________
Total $286,143.00

This total is to be discounted by 25%, the percentage of Bernard's negligence. Accordingly, we amend the jury's verdict and the judgment of the lower court to a total award to plaintiff of $214,607.25, together with legal interest thereon from date of judicial demand until paid, and for all costs and expert fees in the lower court.
All costs of the trial court and this appeal are taxed to defendants.
AMENDED AND RENDERED.