552 So.2d 1348 (1989)
Matthew FALGOUST
v.
RICHARDSON INDUSTRIES, INC., a Wholly Owned Subsidiary of Heldor Industries, Inc., Aqua Pool & Patio, Inc., ABC Insurance Company and DEF Insurance Company.
No. 89-CA-370.
Court of Appeal of Louisiana, Fifth Circuit.
November 15, 1989.
Writ Denied February 2, 1990.
*1349 Edward F. Downing, III, Metairie, for plaintiff-appellant.
Robert E. Couhig, Jr., A. Kirk Gasperecz, Daniel Lund, Alan H. Katz, New Orleans, Gary L. Boland, Baton Rouge, Michael R. Sistrunk, Mark M. Gloven, Robert I. Siegel, Paula L. Marcello, and Stephen C. Hartel, New Orleans, for defendants-appellees.
Gregory M. Porobil, New Orleans.
Before GAUDIN, DuFRESNE and WICKER, JJ.
DUFRESNE, Judge.
This suit involves the adequacy of "no-diving" signs displayed on an above ground residential swimming pool. Matthew Falgoust, plaintiff-appellant, dove into this pool, broke his neck, and as a consequence, is now a permanent quadriplegic. He was seventeen years old at the time of the accident. After a lengthy trial, the jury fixed total damages at $975,000, reduced by 37% for plaintiff's own comparative fault in bringing about his injuries. It further found that the pool owners were 60% at fault, and the two manufacturers of the pool each 1½% at fault. However, before trial plaintiff had settled with the pool owners and one of the manufacturers. The other manufacturer, Esther Williams Swimming Pools, was thus the only defendant *1350 actually cast in judgment for 1½% of $975,000, or $14,625.
Plaintiff now appeals, urging primarily that the jury erred in fixing the percentages of fault of the various parties. He also complains of several evidentiary rulings of the trial judge, as well as allegedly improper jury instructions. His final allegation is that the jury abused its discretion in fixing damages.
The facts of the accident itself, and of plaintiff's consequent injuries, are not disputed. Paul and Susan Lowe were the owners of the pool. Plaintiff is Susan Lowe's half-brother. On July 4, 1985, the Lowes invited several people to their house for a barbeque and swimming, including plaintiff, his mother, and Jimmy Borchers, plaintiff's adult uncle. The pool was an above ground oval type, 15 feet wide by 30 feet long, and uniformly four feet deep. A deck abutting and level with the top of the pool wall had been constructed by the Lowes on one end.
Plaintiff was the first person to enter the pool on the day in question, but he did not dive on that occasion. Paul Lowe then entered the pool by doing a shallow, or "racing" dive from the deck. Plaintiff then also attempted such a dive, but his trajectory was too flat, and he did a "belly-buster" instead. Jimmy Borchers next entered the pool by a "racing dive" without incident. Matthew then again attempted a racing dive from the deck, but entered the water at too steep an angle and hit his head on the bottom, causing irreparable paralysis of most of his body.
The metal sides and frame of the pool, including the warning signs and owners manuals, were manufactured by Esther Williams Swimming Pools. Esther Williams had made the frame under contract with Heldor Industries, Inc., who in turn made the plastic liner, and marketed the entire package under its own trade name. The Lowes responded to a newspaper ad run by Aqua Pool and Patio, a local distributor of Heldor pools, and purchased the pool in question from this distributor in March 1984. Actual installation was done by sub-contractors of Aqua Pool.
At the time of the sale, Rod Guidry, a salesman for Aqua Pool, came to the Lowe's house to discuss various types of pools. Guidry testified that the Lowes decided on a "no diving" model, and he emphasized to them that diving should not be permitted in this type of pool. He further testified that "I told them that if you dive in a shallow pool, that you could break your neck and kill yourself." The Lowes admitted to receiving and reading two owners manuals. The first stated under the heading:
POOL SAFETY
A. CAUTIONS
3. Your pool, even if supplied with a deep end, is a nondiving pool. Diving or jumping into the pool can result in bodily injury and doing so is solely at the risk of the pool owner. (emphasis in original)
5. Your pool has been supplied with a metal safety sign, which is to be attached and displayed near the outside ladder. Be certain that users of the pool are aware of these safety precautions."
The above texts were enclosed in a black ink box and appeared on the first page of the manual.
The second manual similarly stated:

"SAFETY PRECAUTIONS
For your own personal safety, do not dive or jump into or off of the pool. Proper warning signs are provided with your pool and must be displayed prominently. I acknowledge that it is my responsibility to supervise bathers using the pool, and the manufacturer cannot be held responsible for accidents that occur on or about my pool."
The Lowes both testified that they understood that this was a no-diving pool, and had imposed and enforced a no-diving rule with their own children, who at the time *1351 were 12, 10 and 4 years old respectively. Mr. Lowe further stated that he knew it was dangerous to dive in shallow water, but he did not tell plaintiff this, and made no effort to warn him or prevent him from diving in the pool. Lowe also said that he entered the pool by diving about 50% of the time. Mrs. Lowe also admitted that she saw her brother's first dive, but did not attempt to enforce the "no-diving rule" with him, nor did she tell him that it was a "no-diving" pool. Plaintiff's mother, who was sitting on the deck, testified that she had seen the no-diving signs on prior occasions, but didn't notice them on the day of the accident, and didn't attempt to stop her son from diving.
Plaintiff's testimony disclosed that he was familiar with the swimming pool environment and had been swimming in various pools on numerous prior occasions. In answer to the question of whether he knew of the dangers of diving into shallow water, he stated:
"Yeah, I knew about the dangers of diving into shallow waters, but I thought I was good enough of a diver, swimmer, to do it. That is the environment I was in at the time diving" (sic).
He denied, however, seeing any no-diving signs posted on or near the pool.
It is undisputed that there were three no-diving signs at the pool. The first was an eight by eleven inch white sign with orange lettering posted on one side of the pool and facing the deck (Appendix I). The view of this sign was unobstructed, and it was clearly visible to anyone sitting or standing on the deck. The word "caution" appeared at the top in ¾ inch lettering, and there followed a list of five safety rules in ¼ inch lettering, the first of which said "no diving". Other information on the sign exhorted the owners to acquaint their guest with the rules, and stated that failure to observe the rules could result in injury. The two other signs consisted of red ¾ inch block lettering on the white rim of the pool, and said "no diving" (Appendix II). These signs were placed a few inches above water level on the vertical surface of the pool rim at each end of the pool so as to be visible to anyone in the water. The sign at the far end was visible from the deck, and anyone climbing out of the pool onto the deck would have to do so within eight to ten feet of the sign on the deck end.
There was extensive testimony at trial concerning the development of the signs by Esther Williams. This evidence showed that the company had been aware of the possibility of severe injury or paralysis due to people diving in above ground pools since the mid-1970's. The basic design of the signs at issue here had been used on its pools between 1974, when it first marketed this type pool, and 1983. However, by the early 1980's, the company had information that some 15 people had suffered spinal cord injuries by diving into its pools. It further appears that during the late 1970's and early 1980's the entire industry was becoming more aware of this problem.
In response to the problem, Esther Williams began working on new warning signs, and by late 1983 or early 1984, it replaced its old "caution" sign (Appendix I) with a "danger sign" (Appendix III). It further appears that when this change was made, all pools in its own warehouse were repackaged with the new sign. For reasons not clear in the record the Lowes' pool, which they bought in March of 1984, was equipped with the old "caution" sign, rather than the new "danger" sign. Also, by early 1985, Esther Williams had developed a "danger" decal with a "no-diving" pictorial (Appendix IV), to replace the red block letter "no-diving" signs on the walls of the pool. In March of 1985, three months before this accident, it notified Heldor Industries of the sign changes, and sent it a sample decal of the new pool wall sign. At about the same time Esther Williams began a computer list of all pre-1984 pool sales in order to send the purchasers these up-dated signs, but its records did not contain the Lowes' name because their pool had been sold by Heldor. It does not appear that Heldor took any *1352 action to notify prior purchasers of the changes in the signs.
Plaintiff's first allegation here is that the jury was manifestly erroneous in apportioning fault as it did. We disagree. Allocation of fault in comparative negligence cases is a factual determination to be made by the trier of fact, Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La. 1985). Brightman v. Regional Transit Authority, 543 So.2d 568 (La.App. 4th Cir. 1989). As with all factual determinations, such findings cannot be reversed unless the record discloses that they are clearly wrong or manifestly erroneous, Arceneaux v. Domingue, 365 So.2d 1330 (La.1979). Our review of the entire record discloses no such error in the jury's allocation of fault when due regard is given to the factors enunciated in Watson supra.
In regard to the Lowes, the evidence was overwhelming that they knew that diving should not be allowed in the pool. By their own testimony, they established that they knew it was a non-diving pool, that diving in it was dangerous, and that their own pre-teen children were prohibited from diving. No one refuted the testimony of Rod Guidry, the pool salesman, that he informed the Lowes that people diving into the pool could break their necks and kill themselves. Nonetheless, they not only failed to warn or reprimand plaintiff after his first dive, but Paul Lowe encouraged diving by doing it himself. On this evidence the apportionment of 60% of fault to the pool owners was not manifestly erroneous.
As to plaintiff, the jury found that his recovery should be reduced by 37% because of his own comparative fault. Again, we find no manifest error in this factual determination. Plaintiff's testimony was that he knew it was dangerous to dive in shallow water, but thought he could do it anyway. His overall testimony showed that he was familiar with swimming and with the pool environment generally. Although he was seventeen at the time of the accident, there was no showing that he had any diminished mental capacity or mental defect. Considering all of the evidence, we simply cannot say that the jury's finding was clearly wrong. See Murray v. Ramada Inns, Inc., 521 So.2d 1123 (La.1988).
The last 3% of fault was attributed to Esther Williams and Heldor Industries in equal proportions. Plaintiff objects to this determination on three grounds. The first and second concern application of the rule of Bell v. Jet Wheel Blast, 462 So.2d 166 (La.1985); the third alleges that this finding was manifestly erroneous. Esther Williams, for its part has answered the appeal alleging that it was manifest error to find it liable for any portion of plaintiff's injuries.
As to the first two of plaintiff's three arguments, the following actions of the trial judge are pertinent. Plaintiff argued at trial that the rule of Bell, supra, mandated that as a matter of law his negligence should not have been considered in reducing his recovery because to do so would reduce the manufacturer's incentive to produce a safer product. His second argument was that if the Bell analysis on the applicability of comparative fault, is a factual, rather than a legal question, then the jury should have been given the following instruction:
If you should find that a finding of fault on the part of Matthew Falgoust would deter the manufacturer from designing a safer product, then you must not find that Matthew Falgoust contributed to his injuries.
In conjunction therewith, he requested a jury interrogatory as follows:
Would a finding of comparative fault of Matthew Falgoust lessen the manufacturer's incentive to produce a product which is safe for normal use? (If yes, then put 0% for Matthew Falgoust in question 9).
Question 9, of course, asked whether plaintiff's own fault had been a legal cause of his accident.
*1353 The trial judge rejected both the jury charge and the interrogatory on the grounds that the application of the rule of Bell is a legal rather than a factual question. He further determined that comparative negligence was the proper law applicable to this case and instructed the jury accordingly. We agree with both rulings.
The factual basis of Bell was that an employee had been injured due to momentary inattention while doing routine tasks with an industrial machine which was determined to be dangerous. The court held that comparative negligence did not apply to the case because to reduce the worker's recovery because of his slight negligence would not realistically promote careful use of the machine by such workers, and would moreover drastically reduce the manufacturer's incentive to make a safer product if it knew that careless workers would be penalized for their own inadvertence in using the machines.
This court knows of no case where the Bell rule has been applied outside of the context of the workplace, nor of any case where the application of the rule has been deemed a fact question. Plaintiff relies upon Whitacre v. Halo Optical Products, Inc., 501 So.2d 994 (La.App. 2nd Cir.1987) for the proposition that the Bell rule is applicable in a non-workplace context, but defendant correctly points out that the discussion of Bell in that case is dictum. What the Whitacre court actually found was that plaintiff was not comparatively negligent in bringing about his injuries and, therefore, that the defendant's negligence in designing the product was the sole legal cause of plaintiff's injuries.
Moreover, there is nothing in Whitacre which would indicate that the Bell rule is a factual question.
Our review of the cases decided since Bell indicates that the determination of whether comparative fault is applicable to a particular case has always been made by the trial judge or the appellate courts. See Landry v. State, 495 So.2d 1284 (La. 1986), and cases cited therein. We conclude that this determination is therefore a legal question to be decided by the judge, rather than a factual question for the jury, and the trial judge's refusal to give the proposed instruction and interrogatory was correct. We also hold that on the particular facts of this case, the trial judge was correct in applying comparative fault. In Murray v. Ramada Inns, Inc., supra, our supreme court affirmed the application of comparative fault to a plaintiff killed in a diving accident. The facts there were that a motel guest dove into the shallow end of a pool which had no signs warning that it was dangerous to do so. The court approved of a 50% reduction in recovery on a showing that the plaintiff knew that it was dangerous to dive in shallow water. Although the defendant was the owner, rather than the manufacturer of the pool, we find that fact of no legal consequence in the case before us. There is no question that the issue in this case was whether the warning signs supplied by Esther Williams were adequate. In Halphen v. Johns-Manville Sales Corp., 484 So.2d 110 (La. 1986), the court explained that the action for failure to warn is one that raises the question of whether the manufacturer breached its duty to adequately warn of dangers inherent in the normal use of its product which are not within the knowledge of or obvious to the ordinary user. Following Bell, the question here is: Would reduction of plaintiff's recovery realistically promote careful product use, while at the same time not drastically affect the manufacturer's incentive to adequately warn users of its products of potential dangers that might not be obvious. It is our opinion that a reduction would promote safe use, and not affect the manufacturer's incentive to properly warn, and that application of comparative fault was therefore proper in this case.
Plaintiff's third objection to the allocation of fault to Esther Williams is that the 1½% figure was simply wrong. He urges that the correct figure should instead have been 60%. Again, we disagree. There was *1354 voluminous testimony by both plaintiff and defense experts about the signs provided with the pool, and pool safety in general. Plaintiff's expert gave the opinion that the signs developed by Esther Williams in 1984 and 1985 (appendices III and IV) were proper and complied with the American National Standards Institute's recommendations. On the other hand, he found that the signs actually provided with the Lowe's pool were deficient in that they did not sufficiently alert pool users to the severity of injuries which they might sustain by diving. Esther Williams, for its part, presented evidence to show that the signs at issue met, and indeed exceeded, the standards for such signs recommended by the National Spa and Pool Institute, an industry organization.
On the question of the effectiveness of swimming pool signs there was also conflicting testimony. Plaintiff's expert on signs stated that those which indicate the consequences of mis-use are more effective than those which simply warn against such use. He further admitted, however, that regardless of the signs used, there would always be those who ignored them, and stated that pool owners should warn guests about the dangers of diving. Plaintiff's swimming pool safety expert also stated that the signs were ineffective, and noted that the red "no diving" sign on the deck end of the pool was improperly positioned on the inside of the pool wall and thus, not visible to someone intending to dive from the deck. He stated that it should instead have been on the surface of the deck. He too noted that pool owners are responsible for warning guests about diving.
Defendant offered Dr. Glen Egstrom as an expert on aquatic safety, and he was recognized as such by the trial judge. It was this expert's testimony that swimming pool warning signs have proved to be ineffective, no matter how designed. He agreed with all other experts that the most effective way to prevent accidents is by proper education and supervision of swimmers. His opinion as to whether different signs, such as Esther Williams 1984 and 1985 versions, would have prevented the present accident was that they would not have done so. He further testified that there was as yet no consensus in the swimming pool industry as to what types of signs would be most effective in reducing the number of injuries resulting from mis-use of pools.
The homeowners both admitted that they knew it was dangerous to dive, but did not warn plaintiff. Plaintiff testified that he knew diving in shallow water was dangerous.
Taking all of this evidence into consideration, it is clear to this court that the jury's apportionment of fault was based on a permissible view of the evidence, and although this court may have weighed the evidence differently, we cannot on that basis alone reverse that verdict. Rosell v. Esco, D/B/A Jolly Elevator Corp., 549 So.2d 840 (La.1989). We therefore affirm the allocation of fault determined by the jury.
Plaintiff further complains of several evidentiary rulings by the trial court. The first concerns certain testimony by Dr. Glen Egstrom, defendant's expert on swimming pool safety. Plaintiff argues first that this witness was not qualified to testify as an expert on pool safety, and second, even if he were so qualified, he should not have been permitted to give opinions on the design and effectiveness of pool warning signs. As to both objections, we note that a trial judge has much discretion in determining the qualifications and competence of a witness to testify as an expert, as well as in deciding which opinions fall within such a person's expertise. Further, these decisions by the trial judge will not be upset on appeal unless they are manifestly erroneous, Hunnicutt v. Kent, 434 So.2d 91 (La.App. 5th Cir.1982). Dr. Egstrom testified at length about his qualifications which included a career in the study of the kinetics of diving, former chairman of the Diving Safety Control Board U.C.L.A., *1355 where he was also for a time in charge of the safety program for the university's seven swimming pools, chairman of the research committee for the Consumer Products Safety Commission's National Swimming Pool Safety Committee, as well as a member of other swimming safety related organizations. Clearly, the trial judge was not manifestly wrong in permitting this person to testify as an expert in swimming pool safety. Plaintiff further asserts, however, that even were this witness properly recognized as a pool safety expert, he should nonetheless have been precluded from giving opinions as to proper design and efficacy of warning signs. Again, Dr. Egstrom testified that the research committee for the Consumer Products Safety Commission, of which he is chairman, is charged with review of an analysis of available pool signs and standards for such signs. While he admitted that he had never designed such signs, he was nonetheless well versed in current research on the effectiveness of warnings on pool users, as well as various ongoing attempts to develop industry standards for these warnings. We finally point out that the weight to be given the testimony of experts is a matter for the trier of fact, and findings of fact based on such determinations will not be overturned absent manifest error, A. Copeland Enterprises v. Harimaw, Inc., 528 So.2d 707 (La.App. 5th Cir.1988). In the present case, the jury was fully apprised of the qualifications of all experts, and the basis upon which their opinions were based. It was thus free to accept or reject Dr. Egstrom's opinions as to the signs, depending on its assessment of his qualifications to give such opinions. In this circumstance, we conclude that the trial court did not err in permitting Dr. Egstrom to give an opinion as to the signs.
The next issue concerns several advertisements placed in the local newspaper by Aqua Pool and Patio, which showed a small child diving into an above ground pool. Plaintiff sought to introduce these advertisements into evidence because it was through such an ad that the Lowes contacted Aqua Pool. The trial judge determined, however, that they were of little probative value, and might tend to confuse the jury, so he excluded them. Plaintiff urges here that this ruling was incorrect.
In the present posture of the case, this issue is moot. There is no question that the advertisements were designed and published solely by Aqua Pool, and that Esther Williams had no knowledge of them. The jury exonerated Aqua Pool from any liability in the accident, and plaintiff does not allege here that this was error. Instead, he urges that the evidence should have been admitted to show a greater percentage of fault on the part of Esther Williams. But because Esther Williams had nothing to do with the advertisements, their admission into evidence could have had no effect on this determination. We therefore need not determine at this point whether the trial court erred in excluding the evidence.
Plaintiff next urges that it was error for the trial judge to exclude photographs of warning signs purchased by the Lowes and installed at their pool after the accident. Again, we disagree. Plaintiff's argument is that this evidence should have been allowed in order to show the jury that the Lowes were responsible pool owners in that they took subsequent corrective measures to improve the safety of their pool. This evidence was not relevant to the issue before the jury, which was simply whether the Lowes were negligent in bringing about plaintiff's injuries. What they did afterward was of no consequence to this question, and the evidence was therefore properly excluded.
The final evidentiary ruling of which plaintiff complains was the exclusion of a videotape of a 1982 television news show on the potential dangers of swimming pools. He argues that the tape was admissible because it tended to show that Esther Williams had knowledge of the potential dangers of its product to divers as early as 1982, two years before the pool in question *1356 was sold. The newscast in question was a portion of the ABC show 20/20, and was narrated by Geraldo Rivera. The show also featured two experts on pool safety, one of whom was called as a live expert witness by plaintiff at the trial of this matter. The trial judge ruled that the videotape would be excluded on grounds of the hearsay rule. Plaintiff urged at trial, and reurges here, that this was error, citing Toups v. Sears, Roebuck and Co., Inc., 507 So.2d 809 (La.1987). The trial judge found Toups distinguishable because there the written report sought to be introduced had been published by the U.S. Consumer Products Safety Commission, an organization founded by Congress to benefit the public. The court noted that the then applicable rule as to government publications was that because of their trustworthiness, such reports should be admitted in the interest of judicial economy and fairness. It also noted that the then proposed, but now enacted, Louisiana Code of Evidence, art. 902, was to the same effect. The trial judge in the instant case found in substance that because the videotape was not made by any governmental agency or public body, and therefore could not be said to be trustworthy, the rule of Toups was inapplicable. We agree with this conclusion. We further note, that even could it be said that the tape was admissible, plaintiff suffered no prejudice by its exclusion. One of the experts who appeared on the tape, Dr. Alexander Gabrielson, was called as plaintiff's expert on pool safety. He testified more extensively and in greater depth on the dangers of diving in shallow pools then he had done on the tape. Further, Esther Williams admitted to knowledge of these dangers several years before the tape was made, and also that it was aware of the diving accidents which were portrayed on the tape. In these circumstances, exclusion of the tape did not result in any probative facts being withheld from the jury, and any error in excluding it was harmless.
The final issue before us is the adequacy of damages awarded by the jury which were as follows:

A. Physical pain and suffering $50,000
B. Mental suffering and emotional
 stress 50,000
C. Physical disability 200,000
D. Medical expenses (past,
 present & future) 350,000
E. Loss of enjoyment of life 200,000
F. Loss of future income 125,000
 ________
 TOTAL $975,000

The inquiry applicable to appellate review of damages is whether on the particular facts of the case the appellate court can conclude, for articulable reasons, that the award constitutes an abuse of the trier of fact's discretion, Reck v. Stevens, 373 So.2d 498 (La.1979).
The facts of the present case show conclusively that plaintiff has suffered an irreparable injury which will confine him to a wheelchair for life. Specifically, he suffered a spinal cord injury at the C5-C6 level of the neck which has rendered him paralyzed from the neck down. Although he retains movement in his hands and arms, the strength and dexterity of these limbs is limited, and his legs and torso are useless to him. His bladder and bowel functions must be maintained artificially, and he is now sterile and impotent.
On the other hand, his sight, hearing and speech are basically unaffected, and he has suffered no brain damage. Psychologically he has had difficulty in coming to terms with his condition and suffers from depression. He was hospitalized for about three months after the accident and had required periodic hospitalizations to monitor his condition by the time of trial.
As to general damages, plaintiff urges that the awards of $50,000 for physical pain and suffering, and a like amount for mental suffering and emotional stress, were an abuse of the jury's discretion. We note, however, that when the awards for physical disability and loss of enjoyment of life are considered, the award was $500,000 for this entire category of general damages. Although there is some support for plaintiff's assertion that each item of general *1357 damages listed on the jury interrogatories should be reviewed individually for sufficiency, see Bernard v. Casualty Reciprocal Exchange, 534 So.2d 1348 (La. App. 5th Cir.1988), it is our opinion that at least on the facts of this case the proper approach is to examine the total general damage award to determine if there was an abuse of discretion, see Guillory v. Avondale Shipyards, Inc., 448 So.2d 1281 (La. 1984); Andrews v. Mosley Well Service, 514 So.2d 491 (La.App. 3rd Cir.1987); Thissel v. Commercial Union Ins. Co., 476 So.2d 851 (La.App. 2nd Cir.1985). In so doing, we are unable to articulate reasons why the award of $500,000 for general damages was an abuse of the jury's discretion. Although the award is admittedly in the low range and might not have been the figure this court would have awarded had it been the original trier of fact, we nonetheless cannot say that it is so low as to be outside of the jury's discretion. We therefore affirm these elements of damages.
Plaintiff next contends that the award of $125,000 for lost future wages was also an abuse of discretion. The general rule as to lost wages is that the trier of fact must consider all pertinent factors which bear on the probability of reduction of the particular plaintiff's earnings over his work-life expectancy, Philippe v. Browning Arms Co., 395 So.2d 310 (La.1980). While loss of earning capacity can never be calculated with mathematical certainty, in the more usual case of a wage earner who is injured, the task is simplified by the existence of an established earnings base. In the present matter, the jury was in a more difficult position because plaintiff had no past work record and it thus had to rely almost completely on expert testimony to ascertain what in its discretion represented a reasonable figure. That testimony was as follows.
Mr. Charles Paskert was called by the defendant as an expert in vocational rehabilitation, particularly involving placing persons with spinal cord injuries in the work force. He noted that since the accident plaintiff has obtained his GED certificate. He further has good skills and good learning ability, and his I.Q. is in the high average range. It was Paskert's opinion that plaintiff could successfully complete a college associate degree program, and possibly get a bachelor's degree. He further thought that even without college work, with some training plaintiff could get a job paying $5,000 per year. With an associate degree he could earn $12,000 per year, and with a bachelor's degree he could begin at $12,000 per year, but eventually earn up to $25,000 per year. Although Paskert admitted that most quadriplegics remain habitually unemployed, he was more optimistic about plaintiff because of his verbal and intellectual abilities. Plaintiff's expert, Mr. Johnny Dahlberg, similarly testified that statistically, the majority of quadraplegics are unsuccessful in holding jobs, but that some of them are able to do so. Although one of plaintiff's treating physicians, Dr. Schumacher did not think he could be gainfully employed, the other, Dr. Nadell, thought he could perform some types of work. Dr. Nadell was further of the opinion that plaintiff should continue his education and that he was capable of doing so if properly motivated.
Dr. Kenneth Boudreaux testified as the defendant's economist. Because plaintiff had no established earnings record, this witness used as a base the Louisiana average starting yearly wage of a high school graduate, which was $14,635. After adjusting this figure for normal wage increases and discounting it based on prevailing interest rates over a normal work-life, he concluded that plaintiff's wage loss would be between $204,000 and $309,000, if he were unable to work at all for the remainder of his life. He further noted, of course, that were plaintiff to become employed, then the total loss would be proportionately reduced. He also testified that had plaintiff finished high school at the average age and immediately gone to work, he would have lost $33,000 in past wages by the time of trial.
After considering these factors, the jury fixed lost wages at $125,000. Our *1358 review of the same evidence leads us to conclude that based upon reasonable evaluations of the various witnesses' credibility, the jury could properly have concluded that plaintiff will probably be able to earn eight thousand dollars per year, which when applied to Dr. Boudreaux's lower calculations, yields a loss of about $92,000 in future wages. Accepting the $33,000 figure for past lost wages (which is probably excessive because plaintiff was behind at least a year in high school and thus would not have graduated timely) the total loss of wages comes to about $125,000. We thus cannot say that the jury abused its discretion in awarding this amount.
The final issue is the award of $350,000 for past and future medical expenses. Of this amount $145,000 was for past medicals, and this figure is not seriously in dispute. Plaintiff urges that the remaining $205,000 for future medicals was too low, and that the least amount the jury could have awarded based on the evidence was $945,000. He bases this assertion on a report prepared by his expert, Mr. Dahlberg, showing yearly future medicals of $51,000. Using this figure as a basis, Dr. Boudreaux calculated that over an average life-span of 72½ years, the present day value would at a minimum be $945,000. Thus, if Mr. Dahlberg's figure of $51,000 were taken as correct, and plaintiff's life expectancy were assumed to be normal, the higher award might be proper. However, there were a number of items on Dahlberg's list of expenses which the jury might reasonably have rejected. This witness testified that he prepared his report based on plaintiff's medical records, but did not verify these projected medical needs with the treating physicians. The major expense listed in the report was $30,000, for a live-in nurse. While there is no question that plaintiff needs the services of a medical person, on a routine basis, none of his treating physicians testified to his need for around the clock care. The jury may thus have concluded that one eight hour per day medical attendant would be sufficient, and accordingly, reduced this figure by two-thirds to $10,000. This calculation would also have eliminated another $1,800 for board for a live-in nurse. Yet other items, such as $2,000 for housecleaning, and $1,600 for house and lawn maintenance could have been viewed as normal expenses of keeping up a home. Still other expenses which could reasonably have been rejected by the jury were some $1,400 per year for a specialized racing wheelchair, and $600 annually for an all terrain vehicle for fishing and hunting. Deducting these sums from the $51,000 figure leaves $23,600 in annual medical costs, and applying this figure to Dr. Boudreaux's calculations yields $437,000. There was also testimony by Dr. Raoul Bezou, one of plaintiff's treating physicians, that the accident has probably shortened plaintiff's life expectancy by as much as 20 yrs. If the jury had made the further calculation based on a reduction of plaintiff's life span from 52½ years to 32½ years, or some 38%, then the final figure would have been some $270,000 for future medicals. There was further testimony given by Dr. Boudreaux to the effect that if plaintiff were awarded some $700,000 in damages, he could earn between $60,000 and $80,000 per year without diminishing the principal. Considering all of the above factors, this court finds that the jury did not abuse its discretion in awarding $204,000 for future medical care, considering the entire award of $975,000.
We finally note that Esther Williams answered this appeal, seeking to be exonerated from liability in this matter. Because this issue has already been addressed in that portion of this opinion concerning the jury's assessment of fault, we need not address it further here.
For the foregoing reasons, the judgment of the district court is hereby affirmed.
AFFIRMED.
*1359 
*1360 
*1361 
*1362