805 So.2d 277 (2001)
Rebecca Wolcott COX
v.
Billie E. MOORE, et al.
No. 01-878.
Court of Appeal of Louisiana, Third Circuit.
December 12, 2001.
Rehearing Denied February 6, 2002.
*280 Michael A. Pitman, Jones, Odom, Davis & Politz, Shreveport, LA, Counsel for: State of Louisiana, Department of Transportation and Development.
Donald W. Price, Due', Caballero, Price, Guidry, Piedrahita & Andrews, Baton Rouge, LA, Counsel for: Rebecca Wolcott Cox Individually, and on Behalf of Her Minor Children, Brandie Cox and Jerry Cox, Jr.
Court composed of HENRY L. YELVERTON, JOHN D. SAUNDERS, and ELIZABETH A. PICKETT, Judges.
HENRY L. YELVERTON, J.
The State of Louisiana, Department of Transportation and Development (DOTD) appeals a trial court judgment which found it 100% liable for an accident which occurred at an intersection on U.S. Highway 171 near Fisher, Louisiana, in the Parish of Sabine. It appeals both the liability findings and the awards of damages. We reverse in part, amend in part, and otherwise affirm.

FACTS
The accident occurred at the intersection of Highway 171 and Main Street of the Village of Fisher. In the general area, Highway 171 is a two-lane highway going north and south. However, at a point south of the intersection where the accident occurred, the northbound lane splits into two lanes, creating a three-lane highway. Main Street, which leads west to the Village of Fisher, makes Highway 171 the top of a "T" intersection. There is an overhead, flashing caution light at this intersection.
On November 10, 1989, Rebecca Cox was driving north on Highway 171 with her two minor daughters, Darlene and Brandie, in her car with her. It was a clear day. Intending to take a left turn onto Main Street which leads to Fisher, Rebecca stopped in the left lane of the two northbound lanes and activated her left-turn signal.
Meanwhile, Billie Moore was also traveling north on Highway 171. She changed lanes from the right lane to the left lane in order to move from behind a big dump truck. Moore struck Rebecca's vehicle from behind. Since Rebecca's wheels were turned left preparing to make a left turn, her vehicle, when it was hit from behind, was propelled into the path of a moving southbound tour bus. Rebecca's *281 eleven-year-old daughter, Darlene, who was in the front passenger seat, was killed.
Rebecca filed suit against the DOTD and Moore and her automobile insurer. Moore and her insurer settled prior to trial. The case was tried on December 6, 2000. The trial judge found that the highway at this intersection was defective and that the DOTD was 100% liable for the accident. The trial judge awarded Rebecca $1,403,571.01 in damages. He also awarded damages for Brandie's injuries in the amount of $500,000. Jerry Cox, Rebecca's son, was awarded $250,000 in damages.
The DOTD appeals the trial court judgment asserting several assignments of error. The errors involve the trial judge's visit to the accident site, the findings and allocations of fault, and damages.

TRIAL JUDGE'S VISIT TO INTERSECTION
In his reasons for judgment the trial judge indicated that he visited the intersection where the accident occurred because of the conflicting expert testimony on the condition of the intersection presented at trial. The DOTD argues that it was reversible error for the trial judge to conduct a post-trial inspection of the site.
It is permissible for a trial judge to visit a site which is the subject of the litigation before it, not for the purpose of supplying new evidence, but for the purpose of determining, when the evidence regarding such site is in hopeless conflict, which version is worthy of belief. Landry v. Jefferson Davis Parish School Bd., 478 So.2d 194 (La.App. 3 Cir.1985); Dodson v. Webster Parish Police Jury, 564 So.2d 760 (La.App. 2 Cir.), writ denied, 567 So.2d 1127 (La.1990); Estate of Thomas v. State, Dept. of Transp. and Development, 604 So.2d 617 (La.App. 2 Cir.), writ denied, 608 So.2d 167 (La.1992). "Whether such a physical inspection should be made is within the discretionary authority of the trial court." Landry, 478 So.2d at 196.
Reviewing the trial judge's reasons for judgment, it is clear that the court did not conduct experiments at the site, take any measurements, or otherwise create additional evidence. The trial judge merely viewed the site in order to get a better visualization of the location where the accident occurred. Both parties introduced pictures of the site and established the layout of the site through the testimony of witnesses. The trial judge's visit to the site did nothing more than establish a clearer picture in his mind of what was already in evidence and help him decide between the directly conflicting opinions of the expert witnesses. We find no abuse of discretion in the trial judge's visit to the accident site.

FAULT
The DOTD also appeals the trial judge's decision to assess it with 100% of the fault. It argues that the sole cause of this accident was the negligence of Billie Moore.

Fault of the DOTD
One of the complaints of the DOTD is that the trial judge erred in his finding that it had notice of a defect. Because of this error the DOTD maintains that we should give the findings a de novo review. In this regard we agree that the trial judge erred, but not because he found the DOTD had notice, rather, because he required Rebecca to prove notice.
This accident happened in 1989. The Louisiana Supreme Court has held that Louisiana Revised Statute 9:2800 which added an element of "actual or constructive notice" to the "strict liability" cause of action was unconstitutional until November 23, 1995, when the legislature *282 passed Acts 1995, No. 828, which constitutionally allowed the legislature to limit by law the circumstances in which the State will be liable. Jacobs v. City of Bunkie, 98-2510 (La.5/18/99); 737 So.2d 14. Since this accident was in 1989, Rebecca was required to prove only the traditional elements of strict liability under Louisiana Civil Code Article 2317. Dupree v. City of New Orleans, 99-3651 (La.8/31/00); 765 So.2d 1002; Odom v. City of Lake Charles, 00-1050 (La.App. 3 Cir. 1/31/01); 790 So.2d 51, writ denied, XXXX-XXXX (La.6/22/01); 794 So.2d 787. Rebecca had to prove that: (1) the DOTD owned or had custody of the thing that caused the damage; (2) the thing was defective in that it created an unreasonable risk of harm to others; and (3) the defect was a cause-infact of the accident. Id. Rebecca was not required to prove that the DOTD had notice of any defect.
While the trial judge committed an error of law in requiring Rebecca to prove notice, this was not a prejudicial error of law requiring a de novo review because it did not skew the trial judge's finding under the facts of this case. Lasha v. Olin Corp., 625 So.2d 1002 (La.1993); Hebert v. Southwest La. Elec. Mem. Corp., 95-405 (La.App. 3 Cir. 12/27/95); 667 So.2d 1148, writs denied, 96-277, 96-798 (La.5/17/96); 673 So.2d 607, 608. Since the trial judge placed a heavier burden on Rebecca than was required and he still found she proved her case, the error was harmless as to the DOTD. We will review the trial judge's factual findings regarding the fault of the DOTD under the manifest error standard of review.
It is well-settled that a reviewing court may not overturn the trial court's findings of fact unless they are clearly wrong. Cormier v. Comeaux, 98-2378 (La.7/7/99); 748 So.2d 1123. The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the fact finder's conclusion was a reasonable one. Id.
The DOTD's ownership of this highway is not an issue in this case. Regarding the DOTD's duty with respect to its highway conditions, the first circuit recently summarized the law as follows:
DOTD has a legal duty to maintain the highways in a reasonably safe condition. This duty "extends to the protection of those people who may be foreseeably placed in danger by an unreasonably dangerous condition." It extends not only to prudent and attentive drivers, but also to motorists who are slightly exceeding the speed limit or momentarily inattentive. DOTD cannot knowingly allow a condition to exist which is a hazard to a reasonably prudent driver. In such a case, DOTD must take reasonable measures to eliminate or reduce the risks associated with the dangerous condition or may post adequate signs to warn the public of the danger, risk, or hazard involved.
. . . .
The unreasonable risk of harm criterion entails a myriad of considerations and cannot be applied mechanically. Although courts have described the unreasonable risk of harm criterion as requiring the reviewing court to balance the likelihood and magnitude of harm against the utility of the thing, the balancing test required by the unreasonable risk of harm criterion does not lend itself well to neat, mathematical formulations. In addition to the likelihood and magnitude of the risk and utility of the thing, the interpreter should consider a broad range of social, economic, and moral factors including the cost to defendant of avoiding the risk and the social utility of the plaintiff's conduct.
*283 Sevario v. State ex rel. Dept. of Transp., 98-1302, pp. 14-15 (La.App. 1 Cir. 11/10/99); 752 So.2d 221, 231-32, writs not considered, 99-3638, 00-44 (La.4/7/00); 759 So.2d 81, 82, writ denied, 99-3457 (La.4/7/00); 759 So.2d 760 (citations omitted).
At the time of the accident, the DOTD was conducting a resurfacing project in this area. There is no indication that this construction project contributed to the accident other than possibly causing traffic to back up a little more than usual. The speed limit had been reduced in the area from 55 miles per hour to 45 miles per hour due to the construction.
Terry Pantalion, Chief of Police for the Village of Fisher at the time of the accident, explained that mill workers came in and out of the area when the shifts changed because Fisher was home to Boise Cascade and the workers would turn at this intersection to head into Fisher. Due to traffic accidents with the mill traffic at the intersection, the Village of Fisher requested a caution light which was installed several years before the present accident.
Rebecca presented the testimony of Gene Moody as an expert in motor vehicle accident reconstruction, civil engineering, road design construction and maintenance, and traffic engineering. He testified that this intersection was a trap for a northbound driver turning left because all signage encouraged passing in the area. The signage on the highway approaching the intersection designated the left lane as a passing zone by instructing slower traffic to keep right. There was no warning that the use of the intersection required left-turning traffic to be in the left lane when turning or waiting to turn. Thus, in fact, the fastest and slowest traffic were both channeled into the same lanes. He stated that there should have been a warning of the intersection and passing should have been prevented at the intersection. Moody also explained that with simple marking of the lanes, the left lane could become a protected turn lane. Then, someone such as Rebecca would have a protected left turn and this accident would never have happened.
Joseph Blaschke, an expert in highway design, traffic engineering, and accident reconstruction, testified on behalf of the DOTD. Blaschke testified that there is a considerable length of the roadway that is an uphill slope for northbound motorists. He explained that a number of trucks used the roadway and the extra lane created a passing zone which provided a safe passing area for motorists who tend to ignore a no-passing zone when they get behind a slower moving truck. This provides a climbing lane for the slow-moving trucks which allows more traffic to move along.
Blaschke then testified that he counted the number of cars that turned left at this intersection. The count was too low, in his opinion, to meet standards for a left-turn lane at an intersection. Therefore, he would not remove the climbing lane for a left-turn lane, because he felt the hazard was greater for a motorist to pass a slow-moving vehicle on the up-slope and get in an accident.
As testified by Pantalion, a caution light was requested and obtained at this intersection because of the number of cars turning on the road to go to Fisher. It was once a four-lane highway due to the amount of traffic, right at Fisher. Pantalion testified that this stretch of Highway 171, now and at the time of the accident a three-lane highway, is several miles long. Even if one agrees with Blaschke that a passing lane for northbound traffic was desirable, appropriate, specific signing and pavement-markings could have created a *284 protected left-turn lane at the intersection for northbound vehicles that want to turn left to go to Fisher, and could have prevented passing in that limited area. Blaschke testified that the top of the rise is 400 feet south of the intersection and then the road starts going downhill. There is not another uphill slope until beyond the intersection. Moody believed that passing at the intersection itself, which already required a caution light, should have been prohibited. A turning lane could be placed at this intersection relatively easily using paint to mark the lanes. The passing lane could be resumed both before and after the immediate area of the intersection to keep traffic flowing.
Based on this evidence, we find the trial judge did not err in finding the DOTD at fault for this accident. The evidence established that the highway was defective and created an unreasonable risk of harm to a left-turning motorist. This defect was a cause-in-fact of this accident.

Fault of Moore
The DOTD argues that the trial judge erred in not assessing any fault to Moore for the accident despite the overwhelming evidence she failed to maintain control and allowed her vehicle to collide with the rear of Rebecca's vehicle. On appeal, Rebecca argues that it was within the trial judge's discretion to find that Moore was faced with a sudden emergency because she could not see the Cox vehicle when she moved into the left lane.
The sudden emergency doctrine is available to a person who finds himself or herself in a position of imminent peril and does not have sufficient time to consider and weigh all of the best means available to avoid that impending danger. Such a person is not guilty of negligence if he or she fails to adopt what subsequently and upon reflection may have been a better means to avoid the peril.
Babineaux v. Tollie Freightways, Inc., 628 So.2d 1327, 1330 (La.App. 3 Cir.1993).
We are also mindful that Louisiana Revised Statute 32:79 creates a duty for a driver to refrain from switching traffic lanes until it has first been ascertained that such movement can be made with safety. Furthermore, Louisiana Revised Statute 32:81(A) provides that a driver shall not follow another vehicle too close, having due regard for the speed of such vehicle and the traffic and condition of the highway.
There is no dispute that Moore was very familiar with this stretch of Highway 171 and the intersection having traveled it often while living in the area or visiting friends. There is also no indication that she was speeding at the time of the accident. It was a clear day. Trooper William Withers helped Pantalion investigate the accident. They both agreed that Rebecca was stopped, her wheels steered left, when Moore struck her in the rear and propelled her into the oncoming tour bus.
Ray Hall, a Baptist minister on one of the tour buses, testified that he saw Rebecca's vehicle stopped with her left-turn signal on. He stated that all of a sudden he could not see her vehicle anymore.
Moore presented two different versions as to how her car came into contact with the Cox vehicle. In one, the Cox vehicle was stopped, about to turn, when Moore hit her; in the other, the Cox vehicle was moving, turning, and partly in the southbound lane when Moore hit her. At her deposition taken July 8, 1992, she explained that she was following right behind a large dump truck in the right northbound lane as she approached the intersection. When she moved into the left northbound lane she suddenly encountered a *285 small car in front of her which turned out to be the Cox vehicle. Moore observed that Rebecca had her left-turn signal on. She tried to get back into the right lane but could not because another vehicle had already taken that space. Moore testified that she applied her brakes and skidded into Rebecca with her left front fender. It is this version of the accident that Rebecca argues the trial judge believed to find that Moore was faced with a sudden emergency.
Moore gave another deposition several years later on August 26, 1999. This time Moore said that she was behind a dump truck in the right lane, but she pulled into the left lane when Rebecca was 75 yards away. She drove behind Rebecca for a small distance, and then she saw Rebecca begin to slow down and put on her left-turn signal. Moore also slowed down. Rebecca had almost stopped, but Moore believed that Rebecca probably saw nothing coming so she began to turn left. It was then that Moore saw the tour bus. Moore testified that she tried to move into the right lane so Rebecca could back up, but could not because another vehicle cut her off. Moore stated that Rebecca was already two to three feet in the southbound lane by that time. Moore testified that her driver-side headlight hit the Cox vehicle on the passenger-side rear. Moore suspected that Rebecca did not see the tour bus. Moore also testified that the bus would have hit Rebecca anyway because she was already turning when Moore hit her.
Both expert witnesses estimated Moore's speed to have been around 30 miles per hour at the time of her collision with Rebecca. Furthermore, as explained by Blaschke when reviewing the photographs of the vehicles involved in the accident, the damage was more across the entire front and the entire back of the vehicles. He stated that the "angle of impact was not very much at all. It was virtually zero, in other words, just from front to back, almost a flat impact."
There can hardly be any doubt that Moore, in attempting to pass the dump truck, ran into the back of Rebecca propelling Rebecca into the path of the oncoming tour bus. It is obvious that Moore did not ensure that it was safe to switch traffic lanes, which placed her vehicle directly behind a legally-stopped vehicle. Any emergency that Moore faced was due to her own actions. Moore must share some responsibility for her contribution to the cause of this accident.

APPORTIONMENT OF FAULT
Having found that the trial judge erred in finding that Moore was not at fault for this accident, we must adjust the allocation of fault giving deference to the trial court's allocation of fault. Clement v. Frey, 95-1119, 95-1163 (La.1/16/96); 666 So.2d 607.
In Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967, 974 (La.1985), the supreme court explained that, to determine the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relationship between the conduct and the damages:
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last *286 clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
It is obvious that this was a hazardous intersection. The Village of Fisher realized that and requested a caution light which was installed several years before this accident. It was a known fact that drivers liked to turn down Main Street to head into Fisher as testified to by former Chief of Police Pantalion. While providing a passing lane in this area of higher traffic and slopes may help traffic flow and avoid some accidents, the fact remains that the passing lane for southbound traffic was eliminated with no concern for the flow of traffic. The DOTD could have easily recognized the dangerous character of this intersection and prohibited passing while also providing a protected left-turn lane for a northbound motorist. If Rebecca had been in a protected left-turn lane, this accident would never have happened. Furthermore, if passing had been prohibited at the intersection, Moore would probably not have changed lanes and would not have run into the back of Rebecca even without a protected left-turn lane. Either of these two relatively cheap and easy-toimplement devices would have prevented the death of a child.
Under these circumstances, the lowest reasonable amount that could be assessed to Moore was 20% of the fault. Therefore, we place 80% of the fault with the DOTD.

DAMAGES
The DOTD appeals the damages awarded by the trial judge. We first note that Rebecca agrees that the award to Jerry Cox, Jr., who was not in the car when the accident happened, was erroneous and should be reversed. Without further discussion we reverse that award.
Except for funeral expenses, the remaining damages awarded by the trial judge were general damages. The awards of general damages are what the DOTD appeals. The Plaintiff recognizes that the trial judge's allocation of damages among the various items in its reasons for judgment was flawed both in awarding improper elements of damages and in failing to award proper elements such as medical expenses, but argues that the total damages awarded to Rebecca Cox and her daughter, Brandie Cox, were within the trial judge's vast discretion.
We agree that an appellate court should not focus on each individual item of damage, but should focus on the total award before reducing an award of general damages for an abuse of discretion. Stewart v. Select Ins. Co., 93-666 (La.App. 3 Cir. 2/2/94); 631 So.2d 599, writ denied, 94-545 (La.4/22/94); 637 So.2d 159; Andrews v. Mosley Well Service, 514 So.2d 491 (La.App. 3 Cir.), writ denied, 515 So.2d 807 (La.1987); Thissel v. Commercial Union Ins. Co., 476 So.2d 851 (La. App. 2 Cir.), writs denied, 479 So.2d 361, 366 (La.1985); and Falgoust v. Richardson Industries, Inc., 552 So.2d 1348 (La.App. 5 Cir.1989), writ denied, 558 So.2d 1126 (La. 1990). "To do otherwise would make identical awards to identically situated parties subject to different action upon appellate review merely because one trier of fact attempted to show its calculations for each element of general damages while the other simply lumped all elements together into one award of general damages." Thissel, 476 So.2d at 856.
We are mindful of the role of an appellate court in reviewing general damage awards as explained in Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 *287 S.Ct. 1059, 127 L.Ed.2d 379 (1994), and recently reiterated in Duncan v. Kansas City Southern Railway Co., 00-66, pp. 13-14 (La.10/30/00); 773 So.2d 670, 682-83, cert. dismissed, 532 U.S. 992, 121 S.Ct. 1651, 149 L.Ed.2d 508 (2001) (citations omitted):
General damages are those which may not be fixed with pecuniary exactitude; instead, they "involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or lifestyle which cannot be definitely measured in monetary terms." Vast discretion is accorded the trier of fact in fixing general damage awards. This vast discretion is such that an appellate court should rarely disturb an award of general damages. Thus, the role of the appellate court in reviewing general damage awards is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. As we explained in Youn:

Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or decrease the award....
The initial inquiry, in reviewing an award of general damages, is whether the trier of fact abused its discretion in assessing the amount of damages. Only after a determination that the trier of fact has abused its "much discretion" is a resort to prior awards appropriate and then only for the purpose of determining the highest or lowest point which is reasonably within that discretion.
The judgment awarded $1,403,541.01 in damages to Rebecca. On behalf of her daughter, Brandie, she received $500,000.00.[1] The trial judge explained his reasons for the amount of these awards as follows:
Without question, no one would contend that the injuries in this case were not devastating to the plaintiffs. In assessing quantum, this Court recognizes that no amount of money could adequately compensate the plaintiffs for their losses. However, in recognition that a dollar figure must be awarded, this Court finds that the amounts argued in brief by counsel for plaintiff are reasonable and are adopted by this Court as follows:

(1) Rebecca Cox, individually:
 a) Pain and anguish, witnessing daughter's loss of life $ 150,000.00
 b) Loss of life of 11 year old daughter $ 350,000.00
 c) Debilitating injuries, including physical and emotional
 injuries and damages $ 750,000.00
 2) Rebecca Cox, on behalf of Darlene:
 a) Survival action $ 150,000.00
 3) Rebecca Cox, special damages for funeral bill $ 3,571.01
 _____________

*288
 Total damages to Rebecca Cox, general and special $1,403,541.01[2]
 =============
 4) Rebecca Cox on behalf of Brandie Cox:
 a) Wrongful death of 11 year old sister $ 350,000.00
 b) Mental pain and anguish (witnessing death of sister) $ 150,000.00
 _____________
 Total damages on behalf of Brandie $ 500,000.00
 =============

Rebecca Cox
At the time of the accident, Rebecca was a twenty-six-year-old mother of three with a seventh-grade education who testified that her children were her life. Before the accident, she and the children had attended a parade together. One of her last memories of her daughter, Darlene, was looking over at her after the accident and noticing "her head was half-missing" and that she was making a gurgling sound.
Rebecca and her daughters were removed from the car and attended to by medical personnel. Rebecca was transported by ambulance to Sabine Medical Center where she was treated by a family practitioner, Dr. Greg Founds. Rebecca suffered multiple abrasions and contusions on her body. She had a laceration and hematoma on her right arm. She complained that her lumbar spine, abdomen, and right leg were very painful. Dr. Founds noted that her abdomen was tender. He also removed some blood clots from her skin so it would heal faster. Rebecca was hospitalized for observation and treatment with antibiotics for her wounds. Dr. Founds testified that at that time he expected that it would take a few months for Rebecca to heal physically but probably years for her to heal emotionally.
Rebecca gradually improved during her hospitalization, although she had a lot of emotional distress due to the tragedy, and Dr. Founds released her after 48 hours. He next saw Rebecca on November 24, 1989, noting continuing back and hip pain. She also had a lot of foot pain. Rebecca had a piece of glass in her left forearm which was not removed.
Dr. Founds last saw Rebecca on March 28, 1990. She was continuing to have back pain. She also suffered with a slight limp of her right foot and pain in the left leg. Dr. Founds agreed that the loss of a child is an emotional trauma that a parent never overcomes.
Rebecca admitted that she was advised to get psychiatric help after the accident but failed to do so because she did not have any money and thought she could handle it on her own. The accident affected Rebecca so much that after the accident she would ride on the floorboards of cars. Rebecca continues to carry a teddy bear that her daughter was holding in the car before she died.
A psychiatric evaluation revealed that Rebecca has been living with the memory of this accident since it occurred. Rebecca was examined by Dr. Oscar Bienvenu, a psychiatrist associate, on January 30, 1999. He also saw Rebecca on one other occasion. Dr. Bienvenu practiced internal medicine and cardiology for 37 years, then pursued a career in psychiatry. An associate is not board-certified but performs the functions of a psychiatrist and consults a psychiatrist when needed. Dr. Bienvenu *289 observed that Rebecca had symptoms of a post-traumatic stress disorder and depression which were the result of the accident. He stated that Rebecca has a markedly dependent personality disorder and that people with personality disorders are more subject to developing psychiatric diseases.
Dr. Bienvenu's interview revealed that Rebecca had been in and out of depression since the accident. He explained that she continues to suffer with severe post-traumatic stress and that she still has a hard time discussing the accident. She has a hard time coping with the loss of one child and the idea that she was unable to care for one who was in the hospital. Dr. Bienvenu explained that, although Rebecca managed to get through the ordeal without a lot of help from medication and therapy, she was still in terrible shape when he saw her several years after the accident.

Lejeune Damages
The DOTD argues that Rebecca did not carry her burden of proving that her mental anguish or emotional distress was caused by the accident and that it was severe, debilitating, and foreseeable.
Prior to the enactment of Louisiana Civil Code Article 2315.6 the supreme court concluded that mental pain and anguish claims arising out of injury to third persons were permissible. Lejeune v. Rayne Branch Hospital, 556 So.2d 559 (La.1990). In explaining the requirement that the emotional injury must be both severe and debilitating, the court noted:
The emotional distress sustained must be both serious and reasonably foreseeable to allow recovery. Serious emotional distress, of course, goes well beyond simple mental pain and anguish. Compensation for mental pain and anguish over injury to a third person should only be allowed where the emotional injury is both severe and debilitating. For instance, Paugh v. Hanks, 6 Ohio St.3d 72, 451 N.E.2d 759, 765 (1983) held that "serious emotional distress may be found where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." A non-exhaustive list of examples of serious emotional distress includes neuroses, psychoses, chronic depression, phobia and shock.
Lejeune, 556 So.2d at 570 (citations omitted).
We find that Rebecca proved that she suffered severe emotional distress as a result of witnessing the death of her daughter. We find that the trial court did not abuse its discretion in awarding $150,000 for Rebecca's mental anguish at witnessing the death of her daughter, Darlene.

Wrongful Death Damages
The DOTD claims that there is no authority for an award of $350,000 for the loss of life of an eleven-year-old daughter. It argues that the award should be reduced.
Wrongful death damages compensate the designated survivors for their loss of the decedent. La.Civ.Code art. 2315.2. As explained in Duncan, 773 So.2d 670, it is impossible to place a monetary value on the life of a child. Aside from the evidence already discussed, the testimony of Jerry Cox was that since the accident his mother is sad and depressed all the time and that she continues to have problems as a result of the accident which killed his sister.
We find no abuse of discretion in the trial court's award of $350,000 in wrongful death damages to Rebecca for the loss of her daughter, Darlene. See Dartlone v. Louisiana Power & Light Co., *290 33,597 (La.App. 2 Cir. 6/21/00); 763 So.2d 779, and cases cited therein.

Physical and Emotional Injuries and Damages
The DOTD claims that an award of $750,000 for debilitating physical and emotional injuries is unsupported by the evidence. We agree that this award is excessive considering the evidence and the other damages awarded to Rebecca. We find that the highest reasonable amount that could have been awarded to Rebecca for her physical and mental injuries is $200,000.

Survival Action
The DOTD argues that the additional $150,000 award for the survival action was inappropriate in this case because Darlene passed away instantaneously or within minutes of the accident.
A survival action is for the recovery of damages for injury to a deceased from the time the injuries occurred until his death. La.Civ.Code art. 2315.1. "`Damages are properly awarded if there is a scintilla of evidence of any suffering or pain on the part of the decedent by his actions or otherwise.'" Guillot v. Valley Forge Ins. Co., 99-1044, p. 7 (La.App. 3 Cir. 12/8/99); 753 So.2d 891, 896 (quoting Reid v. State, Through DOTD, 25,778, 25,780, p. 10 (La. App. 2 Cir. 5/4/94); 637 So.2d 618, 625, writ denied, 94-1415 (La.9/16/94); 642 So.2d 198). "`Damages may include the decedent's pre-impact fear.'" Id.
Noticing that the oldest child was severely injured, Reverend Ray Hall testified that he told Rebecca he was preacher and asked her permission to stay with Darlene. He went over to Darlene and held her hand. Reverend Hall stated that he told Darlene to squeeze his hand if she knew he was there. She squeezed his hand one time. As he stayed and talked to Darlene, she passed away.
While Darlene did not live very long, she was obviously aware that she was hurt seriously. She could follow commands as she was able to squeeze Reverend Hall's hand on request. It is also very probable that she saw the tour bus just as it was about to directly impact the side of the car where she was seated. Furthermore, her mother heard her gurgling in the car. While this award may be a little on the high side, we cannot say the trial court abused its discretion.

Brandie Cox
The other little girl, Brandie, was injured in the accident. She was eight years old. Brandie does not remember anything about the accident. She was taken first to Many Hospital, and after she was stabilized and intubated, she was transferred by helicopter to Schumpert Medical Center in Shreveport where she was admitted into ICU. Brandie suffered a right scalp laceration and left arm laceration which required sutures. Her major problem was that she suffered a closed head injury. While in the hospital, Brandie was treated by Dr. George Beach, a neurological surgeon. Upon admission he noted that she was quite lethargic but became agitated during stimulation. Her endotracheal tube was removed the day after admission, and her Foley was discontinued four days after admission. Brandie was finally transferred out of ICU five days after admission. Brandie's agitation and restlessness gradually resolved, so she was released from the hospital after eight days.
Following Brandie's discharge, Dr. Beach saw her on November 21, 1989. He diagnosed her with post closed head injury with slight residual ataxia and memory loss.
*291 Reverend Hall and his wife went to visit Brandie in the hospital in Shreveport since her mother could not be there because she was also in the hospital. They would sit with her for hours. It was their observation that Brandie was not aware that they were there. Rebecca testified that when she was released from the hospital, she went to Shreveport to check on Brandie. Brandie was hooked up to machines, so she was not able to speak. Rebecca testified that Brandie was finally taken off the machines and placed in a room where she could stay with her.
At trial Brandie testified that she still has scars on her head, face, and arm. Brandie never finished high school because she had a hard time remembering things after the accident. She testified that she has fully recovered other than her memory problems.

Lejeune Damages
The DOTD argues that the award of $150,000 on behalf of Brandie for the mental pain and anguish associated with witnessing the death of her sister is contrary to the evidence. We agree. Brandie testified that she had no recollection of the accident and there is no evidence to indicate that she did. Therefore, we reverse the $150,000 award.

Wrongful Death
The trial judge awarded Brandie $350,000 for the wrongful death of her sister. Pursuant to Louisiana Civil Code Article 2315.2(A)(3), "[t]he surviving brothers and sisters of the deceased, or any of them, if left no spouse, child or parent surviving" may bring an action for the wrongful death of a sibling. Obviously, Brandie does not have a right of action for the wrongful death damages of her sister because her mother is still living.
However, the trial judge intended to compensate Brandie for her injuries; he just allocated the damages to the wrong items. Established law does not require a trial court to itemize a general damage award. Harper v. Falrig Offshore, Inc., 00-694 (La.App. 3 Cir. 12/20/00); 776 So.2d 620, writs denied, 01-751, 01-816 (La.5/11/01); 792 So.2d 735, 737. We also keep in mind that it is the total award of general damages, and not the individual items, that we must review in determining if there was an abuse of discretion. Thissel, 476 So.2d 851.
There is no question that Brandie was seriously injured in this accident and suffered damages as a result. In making his award the trial judge in reasons for judgment stated that it relied upon the amounts suggested in the post-trial memorandum by Plaintiffs counsel. The posttrial memorandum listed two $350,000 items, one for physical and mental injuries including loss of memory, and the other for the wrongful death of her sister. The trial judge quoted from award descriptions and awarded these amounts exactly as presented in the brief, but omitted an award to Brandie for physical and mental injuries including loss of memory in the amount of $350,000. It is clear that the trial judge intended to compensate Brandie for her injuries in the amount of $350,000, but copied the wrong descriptive language in its reasons for judgment. The trial judge did not err in awarding Brandie damages. Therefore, we find that a total general damage award of $350,000 to Brandie for her injuries was not an abuse of discretion.

LOUISIANA REVISED STATUTE 13:5106
The DOTD claims that the trial court erred in awarding general damages to Rebecca in excess of $500,000 in violation of Louisiana Revised Statute 13:5106. Relying on Chamberlain v. State Through DOTD, 624 So.2d 874 (La.1993), which *292 held that the $500,000 cap was unconstitutional when applied to this 1989 accident, we find that this argument has no merit.
For the reasons discussed in this opinion, we reverse the judgment in part, amend the judgment in part, and affirm the judgment in part. The DOTD is assessed with 80% of the fault, and Moore is assessed with 20% of the fault.
The damage award to Jerry Cox, Jr. is reversed.
The damages awarded to Rebecca Cox are affirmed except to reduce the general damage award by $550,000, for a total general damage award of $850,000. The special damages for the funeral bill of $3,571.01 was not appealed by the DOTD and remains unchanged for a total damage award of 853,571.01.
The damage award in the amount of $150,000 to Rebecca Cox on behalf of Brandie Cox for witnessing her sister's death is reversed. The general damage award of $350,000 on behalf of Brandie is affirmed.
Costs of this appeal are assessed equally to the DOTD and Rebecca Cox.
REVERSED IN PART; AMENDED IN PART; OTHERWISE AFFIRMED.
NOTES
[1] We note, as did the trial court, that Brandie has attained the age of majority but has never filed an action to be substituted as the party to the action, therefore, we will continue the action with Rebecca acting on her behalf. La.Code Civ.P. art. 805.
[2] The trial court's total of the awards should read $1,403,571.01.