## STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 17-218


JOHN KENNEDY

VERSUS

CHRISTOPHER DAVIS, ET AL.


**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 252,108
HONORABLE PATRICIA EVANS KOCH, DISTRICT JUDGE

**********

## JOHN E. CONERY
## JUDGE

**********

Court composed of John D. Saunders, John E. Conery, and D. Kent Savoie, Judges.


**AFFIRMED.**

**Gary J. Russo**
**Ian MacDonald**
**Jones Walker, LLP**
**600 Jefferson Street, Suite 1600**
**Post Office Box 3408**
**Lafayette, Louisiana 70502**
**(337) 593-7600**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
     **BellSouth Telecommunications, Inc.**
     **Christopher Davis**

**Andrew P. Texada**
**3112 Jackson Street**
**Post Office Box 1711**
**Alexandria, Louisiana 71309**
**(318) 487-4910**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
     **BellSouth Telecommunications, Inc.**
     **Christopher Davis**

**Virginia W. Gundlach**
**Jones Walker, LLP**
**201 St. Charles Avenue, 49th Floor**
**New Orleans, Louisiana 70170**
**(504) 582-8570**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
     **BellSouth Telecommunications, Inc.**
     **Christopher Davis**

**Eugene A. Ledet, Jr.**
**Brian M. Caubarreaux**
**Brock H. Duke**
**Robert M. Marrioneaux, Jr.**
**Emily Meche**
**Wesley K. Elmer**
**Brian Caubarreaux & Associates**
**4501 Jackson Street Extension, Suite A**
**Alexandria, Louisiana 71303**
**(318) 442-0900**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
     **John Kennedy**

**CONERY, Judge.**

Following a jury trial, the plaintiff, John Kennedy, was awarded $2,987,000 in damages, and the trial court signed a judgment awarding that amount plus legal interest and costs. Defendants, BellSouth Telecommunications, Inc. and Christopher Davis (BellSouth) now appeal the trial court's judgment. In his answer to appeal, Mr. Kennedy seeks additional damages for past physical pain and suffering, past mental suffering, and past loss of enjoyment of life. For the following reasons, we affirm the judgment in its entirety and deny any additional damages sought by Mr. Kennedy on appeal. All costs of appeal are assessed to defendants Christopher Davis and BellSouth.

## FACTS AND PROCEDURAL HISTORY

Plaintiff, John Kennedy, filed suit for injury to his back allegedly suffered following a May 22, 2014 automobile accident with BellSouth's driver, Mr. Davis. Mr. Kennedy alleges that the injury caused by the accident necessitated his undergoing an eight-level lumbar fusion. Prior to trial, the trial court granted Mr. Kennedy's motion for partial summary judgment and signed a consent judgment finding that the driver of the vehicle, Mr. Davis, and his employer, BellSouth, were solely at fault in the motor vehicle accident, and that Mr. Davis was in the course and scope of his employment with BellSouth at the time of the accident. The case was submitted to a jury only on the issues of medical causation and damages.

The jury found in favor of Mr. Kennedy and awarded him $2,987,000 in damages. The Verdict Form dated June 30, 2016 provided:

**1) DID PLAINTIFF SUFFER DAMAGES AS A RESULT OF THE INCIDENT ON MAY 22, 2014?**

   **YES {X}      NO {  }**

**2) WHAT SUM OF MONEY WOULD REASONABLY COMPENSATE THE PLAINTIFF, JOHN KENNEDY, FOR:**

A.  MEDICAL EXPENSES:

    1. PAST                                 $ 356,000

    2. FUTURE                              $ 266,000

B.  PHYSICAL PAIN AND SUFFERING:

    1. PAST                                 $ 100,000

    2. FUTURE                              $ 500,000

C.  MENTAL SUFFERING:

    1. PAST                                 $ 100,000

    2. FUTURE                              $ 500,000

D.  LOSS OF ENJOYMENT OF LIFE

    1. PAST                                 $ 100,000

    2. FUTURE                              $ 750,000

E. PERMANENT DISABILITY              $ 250,000

F. PERMANENT SCARRING & DISFIGUREMENT   $ 65,000

On July 18, 2016, the trial court entered a final judgment in accordance with the jury's verdict. BellSouth filed a motion for judgment notwithstanding the verdict and remittitur and alternatively, a motion for new trial, which were denied by the trial court on August 29, 2016. BellSouth timely appealed the July 18, 2016 judgment. Mr. Kennedy answered the appeal, asking that the judgment be modified and that damages for past physical pain and suffering, past mental suffering, and past loss of enjoyment of life each be increased.

2

## ASSIGNMENTS OF ERROR

BellSouth assigns the following errors on appeal:

1)      Did the trial court commit plain and fundamental error, thereby interdicting the verdict and necessitating *de novo* review, by:

- failing to instruct the jury under the "Plain Civil Jury Instructions," as mandated by the Louisiana Supreme Court,
- instructing the jury that the only issue it needed to decide was the amount of damages, or
- failing to require that the jury make a specific causation finding on the verdict form?

2)      Under either a *de novo* or manifestly-erroneous standard of review, did Kennedy fail to prove the essential element of causation?

3)      Under either a *de novo* or manifestly erroneous standard of review where Kennedy's treating neurosurgeon recommended multi-level lumbar fusion surgery years *before the accident* to treat Kennedy's scoliosis and degenerative disc disease, and testified that Kennedy would have needed lumbar fusion surgery regardless of the accident, is Kennedy entitled to $620,588 (out of the jury's total award of $622,000) in special damages attributable to the lumbar fusion surgery?

4)      Under either a *de novo* or abuse-of-discretion standard of review, did the trial court err by entering judgment on the jury's verdict when the general damages were excessive, overlapping, and Kennedy failed to meet his burden of proving entitlement to $2,365,000 in general damages?

## LAW AND DISCUSSION

### *Assignment of Error Number One – Jury Instructions – Causation - Jury Verdict Form*

In their first assignment of error BellSouth urges that the trial court committed plain and fundamental error requiring *de novo* review by failing to properly charge the jury, by instructing the jury that the only issue it needed to

3

decide was damages, and by failing to require that the jury make a specific finding of causation on the jury verdict form.

In order to preserve an objection to either the jury instructions or the jury verdict form as an error on appeal, La.Code Civ.P. art. 1793(C) provides:

> A party may not assign as error the giving or the failure to give an instruction unless he objects thereto either before the jury retires to consider its verdict or immediately after the jury retires, stating specifically the matter to which he objects and the grounds of his objection. If he objects prior to the time the jury retires, he shall be given an opportunity to make the objection out of the hearing of the jury.

> *See Nunez v. Wainoco Oil and Gas Co.*, 606 So.2d 1320, 1324 (La.App. 3 Cir.), *writ denied*, 608 So.2d 1010 (La.1992).

Further, La.Code Civ.P. art. 1812(A) provides in pertinent part, "If the court omits any issue of fact raised by the pleadings or by the evidence, each party waives his right to a trial by jury of the issue omitted unless, before the jury retires, he demands its submission to the jury." Additionally, "[a]ppellants who do not object to the special verdict form are not entitled to raise that issue on appeal." *Martinez v. Soignier*, 570 So.2d 23, 30 (La.App. 3 Cir. 1990), *writ denied*, 572 So.2d 94 (La. 1991).

In this case, counsel for BellSouth participated in an extensive jury charge conference which was part of the record on appeal. During the charge conference counsel for BellSouth made three objections, two of which were sustained and one that was withdrawn. No objections on the issue of causation were made by counsel for BellSouth. In fact, counsel for BellSouth is quoted in the record on appeal of the jury charge conference, "I think causation is addressed in others [jury charges] so you can strike the first." A review of the jury instructions on the issue of causation provides that the trial court devoted two paragraphs of the jury

4

instructions to the issue of causation and the law regarding the aggravation of a previously existing medical condition. Again, no objections were made to those jury charges.

On the morning prior to closing arguments and the reading of jury instructions by the trial court, counsel was questioned by the trial court as to whether there were any objections to or changes that needed to be made to the jury instructions or the jury verdict form. Just prior to the jury entering the courtroom, on the final day of trial, the trial court stated, "All right. She's now given me the instructions. Do ya'll want one last look to see that there's not any other edits? Ya'll are satisfied? Okay. Let's bring them out then." Neither counsel responded to the trial court's question. There were no objections to either the jury instructions or jury verdict form noted in the record. Counsel then proceeded to give closing arguments, following which the trial court instructed the jury, explained the jury verdict form, and the jury retired to deliberate.

Even after the jury retired to deliberate, counsel for BellSouth voiced no objections to either the jury instructions or the jury verdict form. None of the complaints as to the jury instructions on appeal were made prior to or immediately following the jury's retiring in this case. Therefore, BellSouth has waived any objections to either the jury instructions or the jury verdict form. La.Code Civ.P art. 1793(C), *Nunez*, 606 So.2d at 1324, *Martinez*, 570 So.2d at 30. BellSouth's assignment of error number one is without merit.

*Assignment of Error Number Two – Causation*

BellSouth urges that Mr. Kennedy failed to prove that the accident at issue caused the need for his extensive eight-level fusion back surgery. Our court has

5

consistently held that, "Causation is an issue of fact subject to the manifest error standard of review." *Hutto v. McNeil-PPC, Inc.*, 11-609, p. 18 (La.App. 3 Cir. 12/7/11), 79 So.3d 1199, 1213, *writ denied*, 12-402 (La. 4/27/12), 86 So.3d 628, *cert. denied*, 568 U.S. 959, 133 S.Ct. 428 (2012).

In *Hayes Fund for First United Methodist Church of Welsh, LLC v. Kerr-McGee Rocky Mountain*, LLC, 14-2592, p. 8 (La. 12/8/15), 193 So.3d 1110, 1115-16, the supreme court reiterated the duty of appellate courts in a manifest error review and stated in pertinent part:

> In all civil cases, the appropriate standard for appellate review of factual determinations is the manifest error-clearly wrong standard, which precludes the setting aside of a trial court's finding of fact unless that finding is clearly wrong in light of the record reviewed in its entirety. *Cenac v. Public Access Water Rights Ass'n*, 02-2660, p. 9 (La. 6/27/03), 851 So.2d 1006, 1023. Thus, a reviewing court may not merely decide if it would have found the facts of the case differently. *Hall v. Folger Coffee Co.*, 03-1734, p. 9 (La. 4/14/04), 874 So.2d 90, 98. Rather in reversing a trial court's factual conclusions with regard to causation, the appellate court must satisfy a two-step process based on the record as a whole: there must be no reasonable factual basis for the trial court's conclusion, and the finding must be clearly wrong. *Stobart v. State through Dept. of Transp. and Development*, 617 So.2d 880, 882 (La.1993).
>
> This test requires a reviewing court to do more than simply review the record for some evidence, which supports or controverts the trial court's findings. The court must review the entire record to determine whether the trial court's finding was clearly wrong or manifestly erroneous. *Parish Nat. Bank v. Ott*, 02-1562, pp. 7-8 (La. 2/25/03), 841 So.2d 749, 753-54. The issue to be resolved on review is not whether the judge or jury was right or wrong, but whether the judge's or jury's factfinding conclusion was a reasonable one. *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989); *Canter v. Koehring Co.*, 283 So.2d 716, 724 (La.1973).

As previously stated, the only issues before the jury at trial were the causal connection between the accident and Mr. Kennedy's subsequent eight-level back fusion and damages. The record demonstrates that no ambulance was called to the scene of the accident, and Mr. Kennedy did not go to the hospital immediately

thereafter. Mr. Kennedy testified at trial that he was not concerned about his back immediately following the accident at issue, but that a few days after the accident his back became "stiff," and he sought medical treatment from his treating physician, Dr. Troy Michael Vaughn.

### Dr. Troy Michael Vaughn's Testimony

Dr. Vaughn is and was Mr. Kennedy's board-certified treating neurosurgeon, and was accepted by the trial court as an expert in the field of neurosurgery. Mr. Kennedy began treatment with Dr. Vaughn in 2012, before the accident in question. Based on his complaints of low back and leg pain, and his physical examination and test results, Dr. Vaughn diagnosed Mr. Kennedy with scoliosis, degenerative disk disease, and stenosis in June of 2012. Dr. Vaughn testified that since Mr. Kennedy became his patient in 2012, he has seen him over two hundred times.

During his testimony, Dr. Vaughn explained to the jury that scoliosis was "basically a deformity of the spinal alignment." Degenerative disk disease is an "injury to the structure of the spine, specifically the disks being the cartilage between the vertebrae." Some disc disease is "hereditary, some of it being injury related." Spinal stenosis usually occurs "when the spinal canal, the channel that contains the nerves, becomes smaller than normal." This causes "compression or impingement of the neural structures, the spinal cord and nerve," which can cause leg pain.

In August of 2012, Dr. Vaughn recommended that Mr. Kennedy undergo a laminectomy at L3-4 to address his low back pain and leg pain. However, Mr. Kennedy chose not to undergo the surgical procedure recommended by Dr. Vaughn at that time, instead choosing to try Dr. Vaughn's alternative

recommendation of "supportive treatment," which included "epidural steroid injections." After undergoing two or three series of injections, Mr. Kennedy ultimately decided to have the L3-4 laminectomy Dr. Vaughn recommended, and he so informed Dr. Vaughn on December 13, 2013.

In Dr. Vaughn's testimony, he reviewed Mr. Kennedy's medical records from the Veterans Administration Hospital (VA) dated August 13, 2013, which indicated that Mr. Kennedy was diagnosed with "scoliosis and right lumbar radiculopathy." Mr. Kennedy was advised by the VA doctors that he could have a laminectomy in Houston, Texas, and he told the doctors at the VA he would think it over.

Ultimately Mr. Kennedy returned to Dr. Vaughn in December of 2013 and advised he was ready to undergo a surgical procedure. Dr. Vaughn then offered Mr. Kennedy two different surgical options. The first was a decompression at L3-4 to treat the nerve impingement and address his leg pain, often called a discectomy or laminectomy, which also had been offered to Mr. Kennedy by the VA. The second surgery was referred to by Dr. Vaughn in his testimony as an arthrodesis or lumbar fusion "from L3 level to the sacrum," which is a more invasive surgery than the laminectomy. Mr. Kennedy chose to have Dr. Vaughn perform the less invasive surgery to address his leg pain. Dr. Vaughn testified that he would not have offered the less invasive procedure of the decompression at L3-4 to Mr. Kennedy as an option unless he thought "it's going to result in some improvement in these symptoms that we're treating."

On January 2, 2014, approximately four months prior to the accident at issue, Dr. Vaughn performed what he described as a microdiscectomy at L3-4, including a laminectomy. The procedure is actually referred to as a

8

hemilaminectomy, which involves the removal of bone on one side of the spine and part of the lumbar L3-4 disc in order to address the areas of nerve root compression that were believed to be causing Mr. Kennedy's leg pain.

Mr. Kennedy returned to Dr. Vaughn on January 17, 2014 and reported that his "left leg pain is ninety percent improved." He again returned to Dr. Vaughn on April 21, 2014, and reported that he was having only mild lumbar back pain, but he did report having a two week period of left leg pain between the January and April visits. Dr. Vaughn testified that it was common for a patient who is going through the healing process after a hemilaminectomy to complain of some recurrent pain due to the inflammation of nerves during and following surgery, and he prescribed a "Medrol Dosepak," which is a steroid dose pack designed to reduce the swelling and inflammation of the nerves at the level of the surgery. Dr. Vaughn termed Mr. Kennedy's sporadic leg pain as a "common finding," and even without the automobile accident approximately one month after the surgery, it would have not been uncommon for Mr. Kennedy to have experienced complaints of leg pain.

Dr. Vaughn reviewed Mr. Kennedy's medical records from the VA for May 7, 2014, two weeks before the accident of May 22, 2014. At that time, Mr. Kennedy only expressed complaints of constipation, no back pain. Following the May 7, 2014 visit to the VA, Mr. Kennedy saw his primary care physician, Dr. Benjamin J. Palombo, at Christus St. Francis Cabrini on May 12, 2014, ten days before the accident, and complained of left leg pain. When questioned as to whether Mr. Kennedy's lumbar procedure had failed before the accident in light of this complaint to Dr. Palombo, Dr. Vaughn testified once again, "it's not uncommon for them to have episodic either back or leg pain" after undergoing a hemilaminectomy.

9

On June 16, 2014, within twenty-five days of the accident on May 22, 2014, Mr. Kennedy went to see Dr. Vaughn and reported he had been in a car accident approximately one month before. Mr. Kennedy told Dr. Vaughn "that his lumbar back pain has been severe – has become severe." Mr. Kennedy reported "the pain is now radiating to the left hip, thigh, extending past the knee to the foot and his symptoms are now interfering with all normal activities."

Dr. Vaughn became concerned that Mr. Kennedy's condition had changed, as the symptoms he was reporting were much more severe than those that he would have expected from a patient that was recovering normally from surgery for a hemilaminectomy. Dr. Vaughn ordered an MRI on July 7, 2014, which "showed a recurrence of his dis[k] (sic) herniation at the L3-4 level." Dr. Vaughn then testified that the accident at issue caused a "recurrent impingement at the L3-4 level . . . I think the accident at least had something to do with him developing his current symptoms. I suspect it is a high probability that it caused him to have recurrent impingement to the L3-4." Dr. Vaughn had previously given consistent testimony in the record during his pre-trial deposition, stating, "it's very probable that the trauma from the accident caused him to develop a recurrent impingement."

Mr. Kennedy followed up with Dr. Vaughn on October 27, 2014, and reported that his symptoms had become more severe, that he could not get comfortable and was unable to sleep. In addition, he was unable to keep his footing and had fallen twice in the last couple of weeks. Dr. Vaughn testified that Mr. Kennedy had never reported falling or had such severe complaints in any of his examinations prior to the surgery in January 2014, or prior to the accident in May of 2014.

In December 2014, Dr. Vaughn recommended a multi-level surgery with fusion from T10-S1. He testified that Mr. Kennedy had no choice but to undergo the more extensive lumbar surgery, having already undergone surgery at L3-4. Mr. Kennedy's spine was further weakened by the previous surgery, by his scoliosis, and by the trauma from the auto accident, making it more unstable. Dr. Vaughn further testified that because Mr. Kennedy's "injury necessitates another surgery you can't just treat the problem there, you have to treat the entire problem because if you do another surgery that surgery will necessitate him having a third surgery for the fusion. So it's all intricately involved, it's all intricately entangled."

Dr. Vaughn recommended a fusion from T10 to the sacrum (S1). Dr. Vaughn testified that at no time prior to December 2014 had he recommended such an extensive surgery to Mr. Kennedy. He clearly gave his opinion that the surgery he was recommending was due to the injuries Mr. Kennedy sustained in the May 22, 2014 automobile accident.

A letter dated March 11, 2015 from Mr. Kennedy's counsel was also introduced into evidence, presented to the jury, and discussed with Dr. Vaughn while he was on the witness stand. The letter reiterated Dr. Vaughn's prior deposition and trial testimony, with the only exception being that when Dr. Vaughn performed the surgery on Mr. Kennedy in April 2015 it was from T10 to S1 and not T11 to S1 as anticipated in March of 2015.

Dr. Vaughn was again questioned at trial as to whether there would have been a need for Mr. Kennedy to undergo any additional surgeries other than the first surgery at L3-4 but for the auto accident in question. Dr. Vaughn testified that he felt that Mr. Kennedy had been undergoing a normal recovery prior to the

11

accident and could have gone ten to fifteen years without further surgery but for the trauma from the accident of May 22, 2014.

Mr. Kennedy did undergo lumbar surgery from T-10 to S-1 in April 2015. He underwent extensive in hospital care and then was discharged to a nursing home because of the extent of his pain and disability. After spending four weeks recuperating in a nursing home, Mr. Kennedy was discharged, but then underwent extreme physical therapy and other rehabilitation.

Dr. Vaughn testified that Mr. Kennedy's "fusion hasn't completely healed … or taken and he's going to have to have at some point another surgery to revise the fusion." This revision procedure was necessary to replace the screws that are "not holding his spine solidly to his pelvis," which causes him to bend forward when he stands up and is called "kyphotic posture." Dr. Vaughn testified that he hoped the revision surgery will correct the problem and relieve Mr. Kennedy's pain. Dr. Vaughn testified in detail about the revision surgery. He stated that Mr. Kennedy would have to undergo the same extensive rehabilitation that was required after the initial eight level fusion surgery in order to restore Mr. Kennedy to an acceptable level. Mr. Kennedy's future prognosis remains guarded.

### Dr. Alan Stuart Joseph's Video Testimony

In support of its case, BellSouth presented the video testimony of Dr. Alan Stuart Joseph in opposition to the live testimony of Dr. Vaughn. Dr. Joseph is a board certified neurosurgeon who practices in Baton Rouge Louisiana. For the past few years, from 2013 to the present, he has specialized in *pediatric* neurosurgery. Dr. Joseph testified that this type of practice does "not as much involve the treatment of degenerative type" of spinal disorders.

Dr. Joseph did not personally examine Mr. Kennedy, but testified that he did not feel compromised in his ability to give an opinion on medical causation and the relationship of the May 2014 automobile accident to the subsequent treatment received by Mr. Kennedy. Dr. Joseph's testimony was based on his review of Mr. Kennedy's medical records, which included imaging and records from Open Air MRI, Christus St. Francis, Cabrini Imaging, Alexandria Neurological Clinic, Harvey Chiropractic, Dr. Robert Rush, Dr. Gerald Leglue, and the VA in Alexandria. Dr. Joseph also reviewed the deposition of Dr. Vaughn, and briefly reviewed Mr. Kennedy's deposition.

Dr. Joseph testified that he had reviewed Mr. Kennedy's MRI taken in December of 2013 and the MRI taken after the accident in July of 2014 and found no sign of trauma. Dr. Joseph then testified that, in his opinion, it was unlikely that the accident was a big part of Mr. Kennedy's continuing back problem. He stated, "For a while, yes, but that is usually measured in terms of weeks or maybe a month or two but not for the rest of your life."

Dr. Joseph testified that even without the accident, Mr. Kennedy would have eventually had to undergo the fusion from T10 to S1 due to the condition of his spine. Dr. Joseph did agree with Dr. Vaughn that the accident sped up the need for a second surgery, but stated, "you're probably talking about a small amount of time … measured in months."

Dr. Joseph did not agree with Dr. Vaughn's opinion that Mr. Kennedy could have gone ten to fifteen years without need for a second surgery if he had not been involved in the accident, considering the condition of his spine pre-accident. Dr. Joseph further reiterated he did not see any injury or re-injury at Mr. Kennedy's L3-4 level, the site of the original surgery.

Counsel for Mr. Kennedy argues that BellSouth had the opportunity to secure by deposition or call to testify at trial any of Mr. Kennedy's other treating physicians, which included Dr. Gerald Leglue, Dr. Robert Rush, and Mr. Kennedy's primary care physician, Dr. Palombo, who saw Mr. Kennedy just ten days prior to the accident. BellSouth chose not to call any additional experts other than Dr. Joseph.

The jury in this case saw and heard Mr. Kennedy as he was testifying. Mr. Kennedy served in the Marine Corps for three years and was deployed to Vietnam in 1967 and 1968. He ultimately went to work for the VA and retired in 2009 with twenty plus years of service. The jury also heard in depth testimony from Dr. Vaughn, Mr. Kennedy's treating physician since 2012. When Dr. Vaughn, Mr. Kennedy's treating physician, was specifically asked if he associated "the [eight-level lumbar fusion] with this automobile accident, he unequivocally replied, "Correct."

The trial court instructed the jury about the role of the treating physician and the greater weight that testimony should be accorded in opposition to a physician that has not served in that capacity. However, the trial court also cautioned that "the treating physician's testimony is not irrebuttable, as the trier of fact is required to weigh the testimony of all the medical witnesses."

Mr. Kennedy has a well-documented and extensive medical history involving his neck and back. However, the jury heard evidence that the accident at issue not only aggravated his pre-existing condition, but caused additional problems. "When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact; for only the fact finder can be aware of the variations in demeanor

14

and tone of voice that bears so heavily on the listener's understanding and belief in what is said." *Canter*, 283 So.2d at 724.

The jury was provided with an adequate factual basis to conclude that the accident at issue caused Mr. Kennedy to undergo the eight-level lumbar fusion, and that he would require further surgery to correct the failed fusion. After a complete review of the record, we find the jury's conclusions as to causation to be reasonable and cannot say that the jury manifestly erred in reaching their conclusion that the May 22, 2014 automobile accident was causally related to the necessity for Mr. Kennedy's extensive surgical procedure and future surgery. BellSouth's assignment of error number two is without merit.

### *BellSouth's Assignments of Error Numbers Three and Four*

BellSouth's assignments of error three and four seek a reduction in both the special damages awarded to Mr. Kennedy for the medical bills associated with the eight-level lumbar fusion surgery and the general damages awarded, which include his extensive rehabilitation and recovery following the surgery. Each will be addressed separately below.

### *Standard of Review - Damages*

> The assessment of "quantum," or the appropriate amount of damages, by a trial judge or jury is a determination of fact, one entitled to great deference on review. As such, "the role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact." *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, 1260 (La. 1993). Moreover,

> > before a Court of Appeal can disturb an award made by a [factfinder,] the record must clearly reveal that the trier of fact abused its discretion in making its award. Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point

15

> which is reasonably within the discretion afforded that court.
> *Coco v. Winston Indus., Inc.*, 341 So.2d 332, 334 (La.1977) (internal citations omitted).

*Wainwright v. Fontenot*, 00-492, p. 6 (La. 10/17/00), 774 So.2d 70, 74.

Further, it is "the well-established principle that 'a defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct[.]'" *Guidry v. Lafayette Health Ventures, Inc.*, 15-307, p. 8 (La.App. 3 Cir. 7/20/16), 203 So.3d 436, 441, *writ denied*, 16-1643 (La. 11/18/16), 213 So.3d 386, quoting *Lasha v. Olin Corp.*, 625 So.2d 1002, 1005 (La. 1993).

### *Assignment of Error Number Three – Special Damages*

> Special damages are those which theoretically may be determined with relative certainty, including medical expenses and lost wages. *Kaiser v. Hardin*, 06–2092 (La. 4/11/07), 953 So.2d 802. An appellate court, in reviewing a jury's factual conclusions with regard to special damages, must satisfy a two-step process based on the record as a whole: there must be no reasonable factual basis for the trial court's conclusions, and the finding must be clearly wrong.

*Monte v. State Farm Mut. Auto Ins. Co.*, 13-979, p. 14 (La.App. 3 Cir. 5/21/14), 139 So.3d 1139, 1149.

The jury awarded $356,000 in past medical expenses and $266,000 in future medical expenses for a total of $622,000. Defendants argue that Mr. Kennedy is only entitled to $1,442 in special damages as medical expenses directly related to the accident. In awarding $356,000 in past medical expenses for the medical expenses directly relating to the accident and the eight-level lumbar fusion, which has since failed, the jury obviously concluded that the extensive surgery and follow up treatment was a result of the accident at issue and awarded special damages accordingly.

Further, the jury heard Dr. Vaughn's testimony that Mr. Kennedy will have to undergo an additional surgery and the rehabilitation that will follow. The jury

likewise concluded that because the first surgery was related to the accident at issue, the surgery to fix that surgery is also the responsibility of BellSouth, as the jury awarded $266,000 in future medical expenses. The jury had the medical bills, Dr. Vaughn's testimony, and the testimony of Bob A. Gisclair (the life care specialist) upon which to base its findings. There is an adequate basis in the record to support the jury's findings. BellSouth's assignment of error number three is without merit.

### *Assignment of Error Number Four – General Damages*

Our court will not alter an award for general damages unless the record clearly reflects that the jury abused its discretion. *Cox v. Moore*, 01-878, p.13 (La.App. 3 Cir. 12/12/01), 805 So.2d 277, 287, *writ denied*, 02-724 (La. 5/31/02), 817 So.2d 94. Additionally the *Cox* court provided:

> Vast discretion is accorded the trier of fact in fixing general damage awards. This vast discretion is such that an appellate court should rarely disturb an award of general damages. Thus the role of the appellate court in reviewing general damage awards is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact.

*Id*. at 287, quoting *Youn,* 623 So.2d 1257.

In this case, the jury witnessed Mr. Kennedy first-hand. The jury was able to hear from Mr. Kennedy, to watch him walk, and to witness his posture. Further, the jury heard from Mr. Kennedy's family who corroborated his testimony.

Mr. Kennedy testified that he used to ride motorcycles, cut his own grass, and work around his house. He had a reasonably active lifestyle for a person of his age. Further, he stated that after the accident, he can now barely get out of the house, and that when he does, it only involves going to the grocery store. The jury concluded based on the testimony presented at trial as well as its observations of

Mr. Kennedy during trial, that Mr. Kennedy was not the same person he was before the accident. The record fully supports the conclusion that he suffers from daily pain, limited mobility, and has a long road ahead of him before reaching some level of recovery.

The testimony of Dr. Vaughn indicates that extensive future surgeries, followed by serious long term rehabilitation are required. It is reasonable from the evidence presented for the jury to find that Mr. Kennedy has suffered extensive pain from his condition that was at the very least, seriously aggravated by the accident at issue. The record fully supports the jury's $600,000 award for past and future pain and suffering, $600,000 for past and future mental suffering, $850,000 for past and future loss of enjoyment of life, $250,000 for permanent disability, and $65,000 for permanent scarring and disfigurement.[1]

We find that the jury did not abuse its vast discretion in awarding $2,365,000 in general damages to Mr. Kennedy. Therefore, BellSouth's assignment of error number four is without merit.

## ANSWER TO THE APPEAL

Mr. Kennedy answered BellSouth's appeal asking this court for an increase in damages for past physical pain and suffering, past mental pain and suffering, and past loss of enjoyment of life. The jury awarded Mr. Kennedy $100,000 in each of these three categories of damages. Mr. Kennedy asks the court to increase each award. However, the jury awarded extensive damages for future physical pain and suffering, future mental pain and suffering, and future loss of enjoyment

---

[1] Though not a published opinion, a panel of this court in the case of *Bordelon v. Cutting Edge*, 14-864 (La.App.3 Cir 2/18/15)(unpublished opinion) recently addressed the issue of general damages awarded in a case with a similar factual basis and affirmed an award of $1,950,000 in general damages.

of life. For this reason and due to the vast discretion afforded to the jury in awarding general damages, we will not award any further damages and affirm the jury's $2,987,000 in total damages in its entirety. *See Cox*, 805 So.2d at 286.

## CONCLUSION

After the judgment was signed, BellSouth filed a motion for judgment notwithstanding the verdict and remittitur, and alternatively a motion for new trial. The trial court scheduled a contradictory hearing and heard extensive argument from defense counsel along the same lines advanced in this court on appeal. The experienced and conscientious trial judge denied the motion, assigning comprehensive and extensive oral reasons, from which we quote:

> So I've reviewed my own notes from that trial and the recollections of that testimony. And so what my memory is vivid on is Dr. Vaughn and how well he knew his patient and that was clear to the jurors that were here. And I went back through the transcript because my memory had that he said he'd seen him over two hundred times and I found it in the transcript that, yes, he said that he'd seen this man over two hundred times, and so that came with a lot of weight, I's say. He also testified for more than an hour or so in front of the jurors. So this is a physician who knew the patient well. And did the first surgery, did the second surgery and so that's the way I take that the jurors certainly believed him and believed his statements when he was very clear on causation. He was passionate about this patient, more so than I think other doctors probably would be of mine that I've not seen two hundred time but this was a doctor who stepped out there and went to battle for his patient and you could tell that. When the second doctor, Doctor Joseph, testified, which was by video, our jurors reacted visibly at some points. They just were not convinced with Doctor Joseph; in such that he was rude about – that I found to be rude about comments on Doctor Vaughn. And that's where I think their jury verdict came from that day.
> Now, Mr. Kennedy, he was certainly a man of not many words; even though I see the transcript is pretty long. But my memory of him is he just more told it like it is and he was repetitive about how he told it like it is. So any sympathy or empathy, he was not one who whined or carried on, that the jury may have developed about him came, I think, from Doctor Vaughn more so than Mr. Kennedy. He was just a tough bird, like you would expect him to be. Military for a long time. …

> Therefore, there is a denial of your JNOV and I don't find that there's
> any reason to reduce the amount of the damages that they've awarded.
> And I don't find that their claims are excessive.

For all of the foregoing reasons, we affirm the judgment of the trial court dated July 18, 2016, in favor of Plaintiff, John Kennedy in its entirety and deny his request for additional general damages on appeal. All costs of this appeal are assigned to Christopher Davis and Bellsouth Telecommunications, Inc.

**AFFIRMED.**